11-4403
Aegis Insurance Services, Inc. v. 7 World Trade Center Company, L.P.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: September 12, 2012                    Decided: December 4, 2013)

Docket No. 11-4403-cv

_____

AEGIS INSURANCE SERVICES, INC., LIBERTY INSURANCE
UNDERWRITERS, INC., NATIONAL UNION INSURANCE
COMPANY OF PITTSBURGH, NUCLEAR ELECTRIC INSURANCE
 LIMITED, CERTAIN UNDERWRITERS AT LLLOYDS,
(Syndicates 1255 and 1511), as subrogor of Consolidated Edison
Company of New York, Inc. and CONSOLIDATED EDISON
COMPANY OF NEW YORK, INC.,

*Plaintiffs-Appellants,*

v.

7 WORLD TRADE COMPANY, L.P.,

*Defendant-Cross-Defendant-Cross-Claimant-Third Party-
Plaintiff-Appellee*,

SILVERSTEIN DEVELOPMENT CORP., SILVERSTEIN PROPERTIES, INC.,

*Defendants-Cross-Defendants-Cross-Claimants-Appellees*,

TISHMAN CONSTRUCTION CORPORATION,

*Defendant-Cross-Defendant-Appellee,*

OFFICE OF IRWIN G. CANTOR, P.C.,

*Defendant-Cross-Defendant-Third Party Defendant-Appellee.[1]*

---

[1]The Clerk of the Court is directed to correct the caption as reflected above.

_____

Before: POOLER, PARKER, and WESLEY, *Circuit Judges*.

Appeal from the September 23, 2011 order and opinion and the September 29, 2011 judgment of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *J*.) dismissing the claims against defendants 7 World Trade Co., L.P., Silverstein Development Corp. and Silverstein Properties, Inc. and the January 12, 2006 opinion and order dismissing the claims against Tishman Construction Corp. and the Office of Irwin G. Cantor, P.C. We affirm on the alternative ground that even assuming negligence on the part of the defendants, any such negligence was not the cause-in-fact of the collapse of 7WTC.

Affirmed.

Judge Wesley dissents by separate opinion.

_____

FRANKLIN M. SACHS, Greenbaum, Rowe, Smith & Davis, LLP, Woodbridge, NJ (Mark L. Antin, Gennet, Kallmann, Antin & Robinson, P.C., Parsippany, NJ, *on the brief*), *for Plaintiffs-Appellants Aegis Insurance Services, Inc., Liberty Insurance Underwriters, Inc., National Union Insurance Company of Pittsburgh, Nuclear Electric Insurance Limited, Certain Underwriters at Lloyds (Syndicates 1225 and 1511), as subrogor of Consolidated Edison Company of New York, Inc., Consolidated Edison Company of New York, Inc*.

KATHERINE L. PRINGLE, Friedman Kaplan Seiler & Adelman LLP, New York, NY (Eric Seiler, Robert D. Kaplan, Kent K. Anker, Jeffrey R. Wang, Christopher M. Colorado, *on the brief*), *for Defendants-Cross-Defendants-Appellees 7 World Trade Company, LP, Silverstein Development Corp and Silverstein Properties, Inc.*

ANITA B. WEINSTEIN, Cozen O'Connor, New York, NY
(Kenneth G. Schwarz, *on the brief*), *for
Defendant-Cross-Defendant-Appellee Tishman Construction Corp.*

STEPHEN P. SCHRECKINGER, Gogick, Byrne & O'Neill,
L.L.P., New York, NY, *for
Defendant-Cross-Defendant-Third-Party-
Defendant-Appellee Office of Irwin G. Cantor, P.C.*

POOLER, *Circuit Judge*:

The 7 World Trade Center Building ("7WTC") stood on the northern edge of the World Trade Center site. As the North Tower collapsed on September 11, 2001, it sent flaming debris spewing into the area around 7WTC. The fiery debris crashed into 7WTC, gouging chunks out of the building. Fires burned on multiple floors. Confident that the people inside had evacuated, grappling with the death of hundreds of firefighters and a non-existent supply of water, the New York City Fire Department made the decision to establish a collapse zone and walk away, rather than fight the fire. After burning for seven hours, 7WTC collapsed, destroying the electrical substation owned by Consolidated Edison Co. of New York, Inc. ("Con Ed") directly underneath the building.

Con Ed, along with its insurers, sued the defendants, who designed, built, operated and maintained 7 WTC, alleging in relevant part that the defendants' negligence caused the building to collapse. The district court disposed of the claims against the defendants in two decisions at issue in this appeal. The first, on January 12, 2006, granted a motion to dismiss brought by a number of defendants involved in the construction of the building, including appellees Tishman Construction Corporation and the Office of Irwin G. Cantor, P.C. *In re September 11 Prop. Damage & Bus. Loss Litig.*, 468 F. Supp. 2d 508 (S.D.N.Y. 2006). The second, issued September 23, 2011, granted summary judgment to appellees 7 World Trade Company, L.P.,

3

Silverstein Development Corp. and Silverstein Properties, Inc. (together, "7WTCo."),  the

building's developer and manager.  *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 865 F. Supp. 2d

370 (S.D.N.Y. 2011).

We affirm the grants of summary judgment, albeit on different grounds than those relied

on by the district court.  We hold that even assuming arguendo negligence on the part of the

defendants, any such negligence was not the cause in fact of the collapse of 7WTC.

**BACKGROUND**

**I.     7 World Trade Center**

The Con Ed substation in question was built in 1970 to provide electric power to the

World Trade Center site, built on land owned by the Port Authority of New York and New

Jersey.  The agreement between the Port Authority and Con Ed allowed the Port Authority to

build above the substation.  In 1980, the Port Authority exercised that right by entering into an

agreement with 7 World Trade Company, L.P. ("7 World Trade") to build 7WTC.  Pursuant to

that agreement, the Port Authority would own 7WTC, which would be designed, constructed and

operated by Silverstein Properties, Inc., 7 World Trade's agent.  7 World Trade held a 99-year

lease on 7WTC.

The substation was built on a trapezoidal parcel of land, and 7WTC was designed as a

trapezoid to mimic the shape of the parcel.  To achieve its design goals, the building included

two sets of support columns: 24 internal load-bearing columns that formed a rectangle at the

center of the structure, and 19 external columns that were laid out along the building's

trapezoidal perimeter.  The trapezoidal shape also required that in the northeast corner of the

building, the steel girders connecting two columns (Nos. 79 and 44) formed an oblique angle,

4

rather than a right angle.  The relevant building standards at the time 7WTC was constructed specified that:

> Through accident or misuse, structures capable of supporting safely all conventional design loads may suffer local damage, that is, the loss of load resistance in an element or small portion of the structure.  In recognition of this, buildings and structural systems shall possess general structural integrity, which is the quality of being able to sustain local damage with the structure as a whole remaining stable and not being damaged to an extent disproportionate to the original local damage.

American National Standard: Minimum Design Loads for Buildings and Other Structures, § 58.1, Section 1.3 (1982).  Construction on 7WTC was completed in 1987.

## II.   Terrorism in Manhattan

In 1984, the Port Authority formed "The Office for Special Planning" (the "Office") to assess the vulnerability of the Authority's various facilities to terrorism.  A report prepared by the Office examined the vulnerabilities of the World Trade Center Complex, noting a number of "Symbolic Bombing Incidents in New York City from 1980 to 1985," including:

- Three people injured in explosion at the Manhattan offices of the airline Aeroflot in 1980, with the Jewish Defense League claiming credit.

- A pipe bomb exploding the sub-basement of New York State Supreme Court in Manhattan in 1981 after warnings of a bomb blast by the Croatian Freedom Fighters.

- Four bombs at stock exchanges and banks in Manhattan in 1982, with Fuerzas Armadas de Liberacion Nacional ("FALN") claiming credit.

- A bomb at the Bankers Trust Company in Manhattan, also in 1982, with FALN again claiming credit.

- A bomb at 250 Broadway (apparently directed toward the New York City Police Benevolent Association) in 1985.

In 1993, a car bomb was detonated in the parking garage below One World Trade Center. *See United States v. Yousef*, 327 F.3d 56, 79 (2d Cir. 2003). Ramzi Yousef, along with several co-conspirators, "drove a bomb-laden van onto the B–2 level of the parking garage below the World Trade Center. They then set the bomb's timer to detonate minutes later. At approximately 12:18 p.m. that day, the bomb exploded, killing six people, injuring more than a thousand others, and causing widespread fear and more than $500 million in property damage." *Id.* Testifying at Yousef's trial, a U.S. Secret Service agent told the jury that Yousef's intent was to cause One World Trade Center to topple, killing tens of thousands of people.

## III. September 11, 2001

The horrific events of September 11, 2001 are well known and need not be repeated here in great detail. Al Qaeda terrorists hijacked four airliners. American Airlines Flight 11 and United Airlines Flight 175 were deliberately crashed into the Twin Towers of the World Trade Center. A third plane, American Airlines Flight 77, crashed into the Pentagon. United Airlines Flight 93 crashed into a field in Shanksville, Pennsylvania during a struggle between the passengers and the hijackers. The planes crashing into Towers One and Two ignited intense fires that burned until both towers collapsed. Altogether, roughly 2,700 people were killed in attacks in New York, including 343 New York City firefighters and paramedics. *See Aegis Ins.*, 865 F. Supp. 2d at 378.

The collapse of the North Tower sent flaming debris spewing beyond Vesey Street, as described in the World Trade Center Building Performance Study:

Debris from the collapsing towers, some of it still on fire, rained down on the surrounding buildings, causing structural damage and starting new fires. The sudden collapse of each tower sent out air pressure waves that spread dust clouds of building materials in all directions for many blocks. The density and pressure of the dust clouds were strong enough to carry light debris and lift or move small vehicles and break windows in adjacent buildings for several blocks around the WTC site. Most of the fires went unattended as efforts were devoted to rescuing those trapped in the collapsed towers. The 22-story Marriott World Trade Center Hotel (WTC 3) was hit by a substantial amount of debris during both tower collapses. Portions of WTC 3 were severely damaged by debris from each tower collapse, but progressive collapse of the building did not occur. However, little of WTC 3 remained standing after the collapse of WTC 1. WTC 4, 5, and 6 had floor contents and furnishings burn completely and suffered significant partial collapse from debris impacts and from fire damage to their structural frames. WTC 7, a 47-story building that was part of the WTC complex, burned unattended for 7 hours before collapsing at 5:20 p.m. The falling debris also damaged water mains around the WTC site . . .

FEDERAL EMERGENCY MANAGEMENT AGENCY, WORLD TRADE CENTER BUILDING PERFORMANCE STUDY 1-8 (2002) (the "FEMA Study") (internal citation omitted).

When firefighters arrived to assess 7WTC, they found a building ravaged by the debris that careened through the air when the North Tower collapsed, with multiple active fires throughout the structure. One observer testified that he saw 10 to 15 floors where "the corner I-beam was missing. And there were more floors that had damage throughout the front facade of the building and several floors were completely exposed." Another testified looking at the south face of 7WTC he observed "flames, you know, broken windows, damage to the building, I-beams sticking out, possible pieces of the plane, I thought." First Deputy Fire Commissioner Frank P. Cruthers testified the exterior of 7WTC "looked like it had been bombarded with large, heavy objects." Others reported structural damage to a section of the building where there were

7

"steel columns, just hanging from its attachment to the upper floors, and there was no walls, no outside walls to that particular side of the building." An elevator car rested in the hallway, "blown out of the elevator shaft, and it was . . . 30 or 40 feet away from where the elevator shaft once was."

Chief of Department Peter Hayden consulted with an engineer:

> We posed to him the question that considering the structural damage that was obvious to the – to the building on the southwest corner, and the amount of fire damage that was occurring within the building, could we anticipate a collapse and if so, when. He said yes and he gave an approximate time of five to six hours, which was pretty much right on the money because the building collapsed about 5 o'clock that afternoon.

Chief Daniel Nigro reported "more fire" at 7WTC on September 11 than he had "seen in [his] entire career" before the fires at the World Trade Center Towers. Both Nigro and Hayden observed fires burning on multiple floors of 7WTC. "Under normal conditions a fire starts at one floor and works its way up and you might have a few floors of fire if the fire department can't get a handle[] on it. It is rare that you see fires on noncontiguous floors in a high-rise." Others reported fire "pushing out of the top floors." Firefighter Tiernach Cassidy reported that "most of the windows were broken on the south face of the building. The entire south face of the building. And where there was a broken window, there was either smoke or fire pushing out of it." Cassidy recalled fires across the south face of 7WTC, and while he could not recall exactly which floors appeared to have fire "it was considerable. It was–it seemed to me, I think the original time I may have said every floor. But what I could estimate at the time it was a lot of fire."

8

The collapse of the Twin Towers destroyed the water main responsible for bringing water to 7WTC, resulting in "significant damage done to the water supply in the area." Firefighters resorted to stretching lines "from the fire boats onto land to provide water supply to fight fires." As the FEMA Study reported:

> Water on site was limited due to a 20-inch broken water main in Vesey Street. Although 7WTC was sprinklered, it did not appear that there would have been a sufficient quantity of water to control the growth and spread of the fires on multiple floors.

At a nearby hydrant on the corner of Vesey Street and West Broadway, a battalion chief reported seeing firefighters "trying to hit [6 World Trade Center] but water was just like– there was water on the sidewalk, there was no pressure in the hydrants, you could tell that there was a problem." A firefighter who entered 7WTC "turned the wheel on the standpipe and found that there was no water in it."

With no water, and no civilian lives at risk, and with their comrades buried in the Towers' debris, the fire department decided to create a collapse zone around 7WTC and allow the fire to burn, unchecked. Hayden explained:

> The decision not to attempt to extinguish the fire in that building was based on the fact that, number 1, the amount of fire that was occurring in the building, the fact that the buildings had been searched and evacuated, and thirdly, and most important I think at that point in time is we had already lost 400 firefighters. The building at this time we deemed to be vacant and we decided not to risk any more firefighters' lives that day.

Deputy Commissioner Cruthers, in command at the time, said:

> The idea was that we expected that this building would come down, my goal at that point was not to lose any more people.
>
> * * *

9

I made up my mind when I assumed command that my primary responsibility was to the living, and . . . although we had a strong obligation to conduct searches and extinguishment operations where we could and those in any building are inherently dangerous.

So it wasn't that we weren't going to do any things that involved danger, but there had to be a favorable risk/reward analysis to justify committing people–what was the upside, what were we going to get, and at that point, not only the firefighters, but the police officers, the Port Authority workers, [Office of Emergency Management] people, everyone was there.

The first obligation is to the people who are alive, and then decide what is the likelihood of a successful effort compared to the risk of their lives.

The building collapsed roughly seven hours after the fire department decided to walk away, at 5:21 p.m., crushing the Con Ed substation.

## II.     Proceedings before the district court

In 2004, Con Ed sued (1) New York City (the "City") and the Port Authority; (2) the owners and lessees of 7WTC; and (3) the design and construction professionals who designed and built 7WTC. *In re September 11 Prop. Damage*, 468 F. Supp. 2d at 512. Con Ed alleged the City negligently designed and installed a diesel-fueled backup generator in space it rented in 7WTC for its Office of Emergency Management. The City moved for summary judgment, which the district court granted, finding the City immune from suit under the New York Defense Emergency Act, N.Y. Unconsol. Law § 9101 et seq. *Id.* at 512. Against the Port Authority, as owner of the 7WTC, Con Ed brought claims for, inter alia, negligent design, maintenance, operation and control of 7WTC, as well as breach of contract. *In re September 11 Litig.*, 640 F. Supp. 2d 323, 329 (S.D.N.Y. 2004). The district court granted summary judgment to the Port

10

Authority on Con Ed's breach of contract and negligence claims, *id.* at 330-42, but that decision was vacated by this Court, *Aegis Ins. Servs., Inc. v. Port Auth.*, 435 F. App'x 18 (2d Cir. 2011). The parties eventually settled. *In re September 11 Prop. Damage & Bus. Loss Litig.*, 491 F. App'x 211, 213 (2d. Cir. 2012).

In April 2005, Tishman and Cantor, among others, moved to dismiss the complaint for failure to state a claim. Tishman, Cantor and the other design and construction defendants argued "three general grounds for dismissal: (1) the absence of a duty of care owed to Con Ed and its insurers; (2) the absence of proximate cause; (3) the inappropriateness of the products liability claims." *In re September 11 Prop. Damage*, 468 F. Supp. 2d at 528. The district court granted the motion to dismiss. The district court found Tishman and Cantor did not owe Con Ed a duty of care because neither was in privity, or a similar special relationship, with Con Ed. The district court concluded that Tishman and Cantor "owe[d] duties of care and proper performance to those entitled to receive the benefit of their work or services or products," but not to third parties such as Con Ed. *Id.* at 531.

Con Ed filed a Second Amended Complaint on July 11, 2008. In November 2009, 7WTCo. moved for summary judgment, arguing that it had no duty to prevent the destruction of the Con Ed substation because the terrorist attack and its consequences were unforeseeable to 7WTCo. In the alternative, 7WTCo. argued that the events of September 11 were an intervening and superseding cause of Con Ed's injury. Con Ed opposed summary judgment, arguing that there were material questions of fact as to whether 7WTCo. negligently designed and constructed 7WTC. In district court, Con Ed offered two alternate theories to support its argument: (1) the building was designed and constructed in such a way that it lacked structural

11

integrity, particularly in the northeast corner of the building; and (2) diesel fuel used in emergency backup generators systems, and stored in tanks throughout 7WTC, fueled the fires in the building, which in turn heated the transfer trusses bearing much of the building's weight. *Aegis Ins.*, 865 F. Supp. 2d at 382-83. Con Ed theorized that the heated transfer trusses expanded and failed, causing 7WTC to collapse into its center. *Id.* On appeal, Con Ed abandons its diesel fuel theory, and now argues only that it should be permitted to present its claim that 7WTC was negligently designed and constructed to a jury.

As the moving papers raised only questions of law, 7WTCo. did not submit expert reports to the district court. In its initial response, Con Ed submitted a few summary declarations, which drew a single declaration from 7WTCo. in support of its reply papers. After the motion was fully submitted, however, Con Ed sought leave from the district court to file supplemental declarations attaching hundreds of pages of expert reports. In granting leave, the district court stated 7WTCo. "[is] under no obligation to respond to the supplemental declarations unless and until the court requires them to do so." At oral argument on the motions, the district court repeated that direction, stating "[i]f I want you to respond, I'll let you know."

Relevant to this appeal, the supplemental declarations filed by Con Ed included several opinions from Con Ed's experts opining, to a reasonable degree of scientific probability, that if 7WTC were properly designed and constructed, it would have survived the events of September 11—a large fire unfought by either internal sprinkler systems or firefighters. Guy Nordenson, a professor of architecture and structural engineering at Princeton University and a practicing structural engineer in New York City, opined that "[b]ased upon my review of available photographic and video evidence, and the deposition testimony of eyewitnesses, including

12

members of the F.D.N.Y., it is my opinion that the collapse of WTC1 or WTC2 did not cause structural damage to any of the core columns of WTC7." His report stated:

> A well-designed building should have sufficient structural integrity to withstand a local failure such as the loss of a single girder with only local consequences. However, as a result of deficiencies in both its overall design and its details, the WTC7 structure lacked redundancy and robustness and therefore did not have sufficient resistance to disproportionate collapse. Its design lacked a fundamental consideration for structural integrity and load path redundancy.

Nordenson opined that:

> the traveling office contents fire present on several floors of WTC7 were determined to have no influence on the cause or the character of the progression of global collapse. Although thermal effects and the presence of fire in the building are critical to the initial local failure mechanism, for the purposes of the global collapse, ambient conditions were assumed because elevated temperatures would only make the structure less resilient.

Instead, Nordenson points to several structural vulnerabilities in 7WTC's design and construction that he opines led to the building's collapse, including (1) "[n]on-code compliant lateral bracing of columns;" (2) "[l]ack of four-sided lateral support for interior columns;" (3) "[m]ultiple interdependent transfer structures;" (4) "[d]iscontinuity of concrete slab diaphragm due to trench headers;" and (5) "[l]ong spans and large tributary areas of interior columns."

Another of Con Ed's experts, Frederick W. Mowrer, an associate professor emeritus in the Department of Fire Protection Engineering at the University of Maryland, opined that "[t]here is a reasonable expectation that firefighters will not engage in, or be effective in, offensive firefighting in high-rise buildings." Mowrer states that "[v]ery tall buildings, such as the WTC7 building, are generally required to be of Type 1 construction." Type 1 buildings, Mowrer stated, are:

13

[a] type of construction in which the structural elements are of incombustible materials with fire-resistance ratings sufficient to withstand the fire severity resulting from complete combustion of the contents and finish involved in the intended occupancy . . . The WTC7 building was not able to withstand the fire severity resulting from complete combustion of its contents without collapsing, thereby violating this principle. Unlike the WTC1 and WTC2 buildings, the WTC7 building was not subject to the additional fuel loads and structural damage associated with the aircraft impacts.

(internal quotation mark and citation omitted). Thus, Mowrer opined:

Because a high-rise building of Type 1 construction should be able to withstand complete combustion of its fuel load without collapsing and with no intervention by manual fire fighting or automatic sprinkler protection, the lack of manual fire fighting and the inoperative automatic sprinkler protection in the WTC7 building on September 11, 2001, should not have caused the collapse of the building.

Mowrer also opined that "the sprayed-on fireproofing material" used in 7WTC "was not properly applied to the fluted steel decking and floor support structural steel beams and girders." This "reduced the fire resistance of the beams, girders and floor assemblies below the level that would have been achieved if these cavities had been properly filled." He opined:

The failure to properly fill the flute cavities with the fire protection material applied to the beams, as required, permitted the girders and beams to heat up more quickly than expected when exposed to an ordinary office contents fire. This more rapid heating would cause the girders, beams and floor assemblies to fail more quickly than expected when subjected to such a fire . . . . [That] was sufficient to cause a failure which would have led to the global collapse of WTC7.

The district court granted 7WTCo. summary judgment. The district court briefly discussed Con Ed's theories as to why 7WTC collapsed, and acknowledged its expert declarations. However, the district court concluded that "the absence of duty . . . makes it

14

unnecessary to explore further, at trial, these complicated and confusing speculations as to how 7 World Trade Center collapsed and what significance the collapse offers on issues of negligence in the building's design or construction." *Aegis Ins.*, 865 F. Supp. 2d at 383. The district court found that while 7WTC may have owed Con Ed a general duty to protect the substation from risk of harm, that duty did not "encompass the long chain of events on September 11, 2001, that eventuated in the destruction of the Con Edison substation." *Id.* The district court explained:

> The risk reasonably to be perceived by 7WTCo. . . . and [its] duty to be obeyed, did not encompass the strange, improbable, and attenuated chain of events that led to 7 World Trade Center's collapse and the crushing of Con Edison's substation. Nothing in common experience or history could give rise to a reasonably foreseeable risk relating to the chain of events flowing from the terrorists and their hijackings to the destruction of the Con Edison substation. . . . To permit a duty to exist under the present circumstances would subject the developer of 7 World Trade Center . . . to uncontrolled and unforeseeable liability. The risks being litigated were not within the zone of reasonable foreseeability, and so extending duty here would create impermissibly broad liability, and would offend New York policy.

*Id.* at 384 (internal quotations and citations omitted). The district court dismissed all claims remaining against 7WTC and entered final judgment in the case. At this point in the litigation, Con Ed appeals from the dismissal of its action against the 7WTCo. defendants, Tishman Construction and Cantor.

## DISCUSSION

"Our standard of review for both motions to dismiss and motions for summary judgment is de novo." *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003) (emphasis omitted). In reviewing a dismissal pursuant to Rule 12(b)(6), we "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all

15

reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). "Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). In reviewing the grant of summary judgment, we "view[] the facts in the light most favorable to the non-moving party." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 233 (2d Cir. 2012). "Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and brackets omitted).

The parties agree that 7WTC collapsed as a result of fire ignited by burning debris from the collapse of One World Trade Center, but on little after that. Con Ed argues that its expert declarations and reports support the conclusion that "inadequate design and construction of 7WTC permitted office contents fires to cause the collapse of 7WTC." Con Ed posits that debris from Tower 1 hit 7WTC, setting off "office contents fires." In broad strokes, Con Ed argues one of the building's girders was not adequately connected to an appropriate column, and this inadequate connection set off a series of failures leading to the building's collapse. Defendants argue 7WTC was properly designed and constructed, but simply could not withstand the events of September 11.

For the purposes of this appeal, we need not delve into the mechanics behind the building's failure. While we conclude that the district court erred in finding the 7WTCo. defendants did not owe Con Ed a duty of care, we nevertheless affirm on the ground that the record before us establishes that, given the unprecedented nature and sheer magnitude of the

16

events of September 11, the alleged negligence on the part of defendants was not the cause-in-fact of the collapse of 7WTC.

The district court erred in granting 7WTCo. summary judgment on the ground that the events of September 11 were not foreseeable, and thus defendants did not owe Con Ed a duty to protect against them. "Under New York law, which applies to this case, a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000) (quotation marks omitted). "Because a finding of negligence must be based on the breach of a duty, a threshold question in tort cases is whether the alleged tortfeasor owed a duty of care to the injured party." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 138 (2002) (internal citations omitted). "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts." *Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) (internal citation omitted). While a plaintiff must establish that a harm was within the ambit of reasonably foreseeable risk, a "[p]laintiff need not demonstrate . . . that the precise manner in which the accident happened, or the extent of the injuries, was foreseeable." *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 315 (1980).

The New York Court of Appeals' decision in *Derdiarian* also guides our analysis here. In *Derdiarian*, the plaintiff worked for a subcontractor hired to seal an underground gas main. A man driving his car suffered an epileptic seizure and passed out, losing control of the car, which barreled into the work site and hit plaintiff so hard he was thrown into the air. *Id.* at 313. The car crashed through the wooden barrier set up on the work site, where it hit plaintiff, as well

17

as a a kettle filled with enamel heated to 400 degrees. *Id.* Plaintiff burst into a fire ball but somehow survived the accident. At trial, plaintiff argued that the subcontractor failed to adequately protect the workers at the excavation site. The Court of Appeals held that:

> Serious injury, or even death, was a foreseeable consequence of a vehicle crashing through the work area. The injury could have occurred in numerous ways, ranging from a worker being directly struck by the car to the car hitting an object that injures the worker. Placement of the kettle, or any object in the work area, could affect how the accident occurs and the extent of injuries. That defendant could not anticipate the precise manner of the accident or the exact extent of injuries, however, does not preclude liability as a matter of law where the general risk and character of injuries are foreseeable.

*Id.* at 316 -17.

The district court based its duty analysis on Judge Cardozo's canonical holding that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Aegis Ins.*, 865 F. Supp. 2d at 383-84 (quoting *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 343 (1928)). The district court found that:

> It was not within 7WTCo.'s . . . 'range of apprehension' that terrorists would slip through airport security, hijack an airplane, crash it suicidally into the one of the two tallest skyscrapers in New York City, set off falling debris that would ignite a building several hundred feet away, cause structural damage to it, destroy water mains causing an internal sprinkler system to become inoperable, kill 343 firemen, and paralyze the rest so that a fire within a building would not be put out and the building would be allowed to burn an entire day before it consumed itself and collapsed.

*Id.*

The district court's foreseeability analysis misses the mark. "Foreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist."

18

*Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 231 (2001) (internal citations omitted).

Determining the scope of a defendant's duty "necessitates an examination of an injured person's reasonable expectation of the care owed and the basis for the expectation and the legal imposition of a duty." *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 585 (1994) (internal citation omitted).  The parties, and the district court,  agree that "there is no question that Con Edison may generally claim a duty from 7WTCo. . . . not to expose it to unreasonable risk because of negligent building design, construction, or maintenance." *Aegis Ins.*, 865 F. Supp. 2d at 383.  New York law makes plain that Con Ed need not show 7WTCo. foresaw the precise risk of terrorists hijacking planes and flying them into Towers One and Two, setting off the chain of events leading to 7WTC's collapse.  As in *Derdiarian*, 7WTCo. is not charged with "anticipat[ing] the precise manner of the accident." 51 N.Y.2d at 316-17.  The risk of massive fire at a high-rise building such as 7WTC is a foreseeable risk, and the district court erred in finding otherwise.  How that fire started plays no part in the foreseeability analysis for the purposes of determining whether 7WTCo. owed Con Ed a duty.

Finding 7WTCo. owed Con Ed a duty, however, does not settle the matter of liability.  Once a duty is established, to prevail Con Ed must prove a breach of that duty, and that the breach was the cause of Con Ed's injuries.  There is an alternate ground for affirming the grant of summary judgment to defendants: even assuming arguendo negligence on the part of the defendants, any such negligence was not the cause-in-fact of the collapse of 7WTC.  In New York:

> Causation incorporates at least two separate but related concepts:
> cause-in-fact and proximate cause. Cause-in-fact refers to those
> antecedent events, acts or omissions which have so far contributed
> to the result that without them it would not have occurred . . . .

19

> Proximate cause serves to limit, for legal or policy reason, the responsibility of an actor for the consequences of his conduct.

*Monahan v. Weichert*, 442 N.Y.S.2d 295, 298 (4th Dep't 1981) (internal alterations and citations omitted). The trend in New York cases is to focus analysis more on "substantial factor" or proximate cause analysis and less on cause-in-fact analysis.[2] However, it remains "the general rule that in common-law negligence actions, [that] a plaintiff must prove that the defendant's conduct was a cause-in-fact of the injury." *Hamilton*, 96 N.Y.2d at 241. We find it especially difficult to shoehorn this extraordinary sequence of events into the "welter of confusion" that is proximate cause. *See* Prosser & Keeton, The Law of Torts (5th Ed. 1984) § 41 at 263; *see also Derdiarian*, 51 N.Y.2d at 314 ("The concept of proximate cause, or more appropriately legal cause, has proven to be an elusive one, incapable of being precisely defined to cover all situations. This is, in part, because the concept stems from policy considerations that serve to place manageable limits upon the liability that flows from negligent conduct."). When faced with the unique constellation of events that comprised September 11, 2001, we find it most appropriate to return to a bedrock principle of tort law that for there to be a recovery for an injury, it must be established that defendant's act was a cause-in-fact of an injury if there is to be a recovery.

This principle requires a plaintiff to establish, beyond the point of speculation and conjecture, a factual, causal connection between its losses and a defendant's actions. As the

---

[2] *See, e.g., Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 520-21 (1980) (using language of "substantial causative factor"); *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 314-15 (1980) ("To carry the burden of proving a prima facie case, the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury.").

Court of Appeals stated in *Bernstein v. City of New York*:

> A jury verdict must be based on more than mere speculation or guesswork. Where the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury. If there are several possible causes of injury, for one or more of which defendant is not responsible, plaintiff cannot recover without proving the injury was sustained wholly or in part by a cause for which the defendant was responsible.

69 N.Y.2d 1020, 1021 (1987) (internal citations and quotation marks omitted).[3] A defendant's conduct is not a cause-in-fact of an injury or loss if the injury or loss would have occurred regardless of the conduct. *See* Prosser & Keeton, The Law of Torts § 41 (5th Ed. 1984).

On the record before us, we find that Con Ed failed to present evidence sufficient to raise a genuine issue of fact as to whether defendants' negligence was the cause-in-fact of Con Ed's injury. *See Adirondack Transit Lines, Inc. v. United Transp. Union*, 305 F.3d 82, 88 (2d Cir. 2002) (our Court may "affirm the district court on any ground for which there is support in the record, even if not adopted by the district court"). We therefore affirm the dismissal of the claims against defendants on this alternate ground.

Con Ed's primary argument is an unfought fire would not have caused 7WTC to collapse had the building been property designed and constructed. But Con Ed's focus on the fires that engulfed 7WTC carves what occurred at 7WTC out of the series of events that occurred on

---

[3]"This does not mean that plaintiff must eliminate every other possible cause" for his injury. *Ingersoll v. Liberty Bank of Buffalo*, 278 N.Y. 1, 7 (N.Y. 1938). Rather, "[i]t is enough that he shows facts and conditions from which the negligence of the defendant and the causation of the accident by that negligence may be *reasonably* inferred." *Id.* (emphasis added) (internal citation omitted).

21

September 11, and this we cannot do. This failure to relate the constellation of events surrounding the collapse of 7WTC or to link the unprecedented nature of those events with the negligence at issue is fatal to Con Ed's claims. Under Con Ed's approach to liability, those who designed and constructed the building would presumably be liable if, for example, 7WTC collapsed as a result of a fire triggered by a nuclear attack on lower Manhattan. While the concepts underlying tort law must, by their nature, be fluid, at the end of the day they must engage with reality.

Although Con Ed proffered expert reports speculating how various design features of 7WTC could have been modified to withstand collapse, we find the reports too speculative to avoid summary judgment, even drawing all inferences in favor of Con Ed. Con Ed's experts opine that a properly designed building would have withstood "a local failure" as well as "complete combustion of its fuel load without collapsing and with no intervention by manual fire-fighting or automatic sprinkler combustion." In support of these assertions, the experts point to several "vulnerabilities" in 7WTC's design and construction based on their review of photographs of the scene and of computer modeling.

None of the expert reports, however, address in any substantive or adequate way the interaction between the identified "vulnerabilities" and the unprecedented etiology and severity of the cataclysm that engulfed lower Manhattan on September 11, 2001. The failure to connect the defendants' alleged negligence to the events of the day renders the proffered reports too speculative and conjectural to create triable issues of fact. While one expert opines that "the collapse of WTC1 or WTC2 did not cause structural damage to any of the core columns of WTC7," the record testimony from witnesses present at the scene is that the terrorist attacks

22

caused significant damage to 7WTC as a whole. The crashing of airplanes into the Twin Towers, and the Towers' subsequent collapse, caused debris to cascade onto 7WTC, tearing off chunks of 7WTC's walls and floors. Falling, burning debris from the Towers also triggered multiple fires on multiple, noncontiguous floors of 7WTC, unusual in a high-rise building. The collapse of the Towers severed the water main responsible for bringing water to 7WTC, leaving the firefighters and 7WTC's sprinkler system without water. When the Towers collapsed, 343 firefighters were killed. *Aegis Ins.*, 865 F. Supp. 2d at 377. Among their numbers were members of New York City Fire Department's special operations units, including its specially trained high rise units. Faced with this unprecedented constellation of events, fire department commanders chose to let the building burn rather than fight the fire. The fire raged unabated for roughly seven hours before the building collapsed. We have little trouble concluding that the confluence of these events demonstrates that 7WTC would have collapsed regardless of any negligence ascribed by plaintiffs' experts to the design and construction of 7WTC more than a decade earlier. It is simply incompatible with common sense and experience to hold that defendants were required to design and construct a building that would survive the events of September 11, 2001.

## CONCLUSION

For the reasons given above, the judgment of the district court is AFFIRMED.

23

WESLEY, *Circuit Judge*, dissenting:

Plaintiffs' experts have articulated a standard of care: high-rise buildings must be built to withstand a fire that cannot be extinguished by the efforts of firefighters. Plaintiffs' experts have also identified a deviation from that standard: the building was designed and erected in such a way that it was subject to failure if a fire broke out that could not be quelled. They have tied that standard and its deviation to the injury for which they seek recompense. Lastly, plaintiffs' experts have offered opinions that 7WTC did not collapse as a result of structural damage from falling debris.

One would think that, on this record, the majority, would want to hear from defendants' experts on why 7WTC collapsed. It may well be that causation, be it proximate or in fact, can be decided as a matter of law in the district court after a careful review of all expert submissions or that a trial will result in a defendants' verdict, but that is not the path the majority has chosen for this case. I would remand the matter to the district court for trial. I, therefore, respectfully dissent.