**FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for AmTrust Bank, Plaintiff,**

v.

**Michael HODGE, et al., Defendants.**

No. 09–CV–3234 (MKB).

United States District Court, E.D. New York.

Signed Sept. 26, 2014.

James L. Defeo, Laura L. Watson, William W. Jacobs, Thompson Hine LLP, Cleveland, OH, for Plaintiff.

Mark Lewis Housman, Brian J. Divney, Housman & Associates, P.C., Tarrytown, NY, Lafleur Alicia David, Lafleur A. David, Esq., Brooklyn, NY, Perry Ian Tischler, Bayside, NY, for Defendants.

### *MEMORANDUM & ORDER*

MARGO K. BRODIE, District Judge.

AmTrust Bank ("AmTrust") filed a Complaint on July 28, 2009, against Defendant Lea Jordan and others. (Docket Entry No. 1.) On January 7, 2010, the Federal Deposit Insurance Corporation

("FDIC"), as Receiver for AmTrust Bank, was substituted as Plaintiff. (January 7, 2010 Order.) On July 31, 2012, and August 6, 2012, Plaintiff filed an Amended Complaint and a corrected Amended Complaint, respectively against several persons and organizations, including Defendants Liberty Land, Abstract, Inc. ("Liberty") and Atlas Abstract Agency Corp. ("Atlas"), alleging that Defendants deprived Plaintiff of millions of dollars in proceeds from AmTrust's loans. (Docket Entry Nos. 210–11.) Specifically, as to Atlas, Plaintiff asserts claims of breach of contract, breach of fiduciary duty, negligence, fraud and conspiracy to commit fraud. As to Liberty, Plaintiff asserts claims of negligence, fraud and conspiracy to commit fraud. Discovery closed on February 21, 2013. (*See* Minute Entry dated February 21, 2013.) Atlas moved for summary judgment on all claims against it. Plaintiff and Liberty cross-moved for summary judgment on all claims against Liberty. The motions for summary judgment were referred to Magistrate Judge James Orenstein for a report and recommendation.

By Report and Recommendation ("R & R") dated August 22, 2014, Judge Orenstein recommended that the Court: (1) grant Atlas' motion for summary judgment as to the claims of breach of contract, breach of fiduciary duty, negligent supervision, and negligence involving the Hempstead property; (2) deny Atlas' motion for summary judgment as to the claims of negligence involving the Willoughby Avenue and Jackson Heights properties, fraud and conspiracy to commit fraud; and (3)

deny Liberty's and Plaintiff's cross-motions for summary judgment on all claims against Liberty. (Docket Entry ("DE") 294.) On September 12, 2014 Atlas filed objections.[1] (DE 296.) No other objections were filed. For the reasons set forth below, the Court adopts the R & R in its entirety.

## I. Background

### a. Relevant Parties

Between October 28, 2008, and February 12, 2009, AmTrust made twenty home mortgage loans to borrowers based in New York. (Compl. ¶ 4; DE 276 ¶ 1; DE 281.1 ¶ 1.)[2] AmTrust was closed by the Office of Thrift Supervision on December 4, 2009. (DE 276 ¶ 2; 281.1 ¶ 2.) FDIC was appointed as AmTrust's receiver and FDIC was substituted as Plaintiff in this action by Order dated January 7, 2010. (Jan. 7, 2010 Order.)

Link One Mortgage Bankers, LLC ("Link One") is a mortgage broker incorporated under the law of New York. (Compl. ¶ 32.) AmTrust contracted with Link One to provide brokerage services and Link One brokered each of the subject loans. (*Id.* ¶¶ 33–34.) James G. Carroll represented AmTrust with respect to each of the subject loans. (*Id.* ¶ 38.)

Atlas is a New York company and acted as title agent in three of the subject loans. (DE 276 ¶ 6; DE 281.1 ¶ 6.) Liberty is a New York company and acted as a title agent with respect to two of the subject loans. (DE 287.8 at 1; DE 282.2 ¶ 1.) As

---

1. Atlas filed duplicate objections on September 15, 2014. (DE 297.)

2. Given the multiple parties and filings corresponding to the present motions for summary judgment, the Court will refer to the undisputed statement of facts submitted by each party, pursuant to Local Rule 56.1, by the following docket numbers: Docket Entry 276

(Atlas' statement of material facts); 281.1 (Plaintiff's response to Atlas' statement of material facts); 282.2 (Plaintiff's response to Liberty's statement of material facts); 283.2 (Plaintiff's statement of material facts); 287.8 (Liberty's statement of material facts); 290 (Liberty's response to Plaintiff's statement of material facts).

title agents, Atlas and Liberty issued title commitments, which set forth, *inter alia,* the identity of the current vested owner of the property in question and the source of the vested owner's title.

### b. Defendants' alleged scheme

Plaintiff alleges that Defendants have "engaged in or enabled" a mortgage fraud scheme in which "straw" borrowers applied to AmTrust Bank for loans. (Am. Compl. ¶ 1.) The borrowers purported that these loans were wanted in order to purchase residential properties from certain sellers at a fair value. (*Id.* ¶ 4.) However, at the time borrowers applied for the loans, and sometimes at the property closings, the alleged sellers did not actually own the subject properties. (*Id.* ¶ 6.) When an AmTrust loan closed, the alleged sellers would arrange to purchase the properties from the actual owners for a fraction of the price represented to AmTrust. (*Id.* ¶ 10.) The property would then be "flipped" and deeded to the borrower. (*Id.*) Pursuant to this scheme, Defendants successfully funded the purchase of property and absconded with hundreds of thousands of dollars in loan proceeds. (*Id.* ¶ 11.)

As succinctly stated in the R & R, "[t]he gravamen of [Plaintiff]'s claims against the title agent defendants, including Atlas and Liberty, is that they acted negligently or fraudulently with respect to the issuance of pre-closing title commitments that contained inaccurate or incomplete information regarding the title history of the subject properties." (R & R 342.) According to AmTrust, it relied on these title commitments in order to ensure compliance with its seasoning requirement, which "required that title to the property be vested in the

seller for at least three months ...." (Brennan Aff. ¶ 5.)

### c. The Atlas Loans

Atlas was involved in three subject loans. (DE 276 ¶ 6; DE 281.1 ¶ 6.) Specifically, Atlas was involved in loans pertaining to the following borrowers and properties: (1) Waltnel Sosa and 485 Willoughby Avenue, Brooklyn, New York ("Willoughby Avenue property"); (2) Kamrun Nahar and 35–16 87th Avenue, Jackson Heights, New York ("Jackson Heights property"); and (3) Lea Jordan and 140 Weir Street Hempstead, New York ("Hempstead property"). (DE 276 ¶ 7; DE 281.1 ¶ 7.) Originally, Morning Star Abstract, LLC ("Morningstar") was meant to be the title agent at the closing of the three loans. (DE 276 ¶ 10; DE 281.1 ¶ 10.) Atlas' title insurer, Security Title Guaranty Company of Baltimore ("Security") was also the title insurer for Morningstar. (DE 276 ¶ 10; DE 281.1 ¶ 10.) After Morningstar ceased operations, an attorney for Security, John Montinico, asked Felice McMahon, the sole owner of Atlas, to "take over" Morningstar's files. (DE 276 ¶¶ 9–10; DE 281.1 ¶¶ 9–10.) Montinico brought Atlas the files and directed Atlas to use Michelle Baker as the title closer, given her familiarity with the files. (DE 276 ¶ 10; DE 281.1 ¶ 10.) Baker attended the closings of all three loans, acting as the title closer on behalf of Atlas. (DE 276 ¶ 12; DE 281.1 ¶ 12.)

### i. Willoughby Avenue property

Atlas prepared a title commitment for the Willoughby Avenue property. (Deposition of Felice McMahon ("Atlas Dep."), annexed to the Affidavit of Felice McMahon ("McMahon Aff.") as Ex. A, 90:10–12.) There are two "Schedule A" forms in the record.[3] One Schedule A ("First Schedule

---

**3.** Schedule A forms, produced by Atlas, list the mortgagor, mortgagee, the amount of the mortgage, and mortgage tax paid. (Deposition of Felice McMahon ("Atlas Dep."), annexed to the Affidavit of Felice McMahon ("McMahon Aff.") as Ex. A, 58:12–17.)

A") represents that effective January 11, 2009, Brooklyn Renaissance & Development, Inc. ("BRD") acquired the Willoughby Avenue property by deed, dated September 25, 2008, from UBS Real Estate Securities, Inc. ("UBS"). (Atlas Dep. 123:2–23; Ex. 1, annexed to the Affidavit of Melanie Burke ("Burke Aff.").) The First Schedule A was incorrect. The second Schedule A form ("Second Schedule A") represents that effective January 11, 2009, UBS acquired the Willoughby Avenue property by deed dated April 15, 2008, from U.B. Bank National Association.[4] (Ex. C, annexed to McMahon Aff.)

On February 2, 2009, when the Willoughby Avenue property loan closed, BRD did not actually own the Willoughby Avenue property as purported by the First Schedule A. Instead, UBS was the owner of the Willoughby Avenue Property and a deed, obtained from the Automated City Register System ("ACRIS"), shows that on February 25, 2009, UBS transferred the property to U.S. Bank National Association in a trustee capacity. (Ex. A–2, annexed to the Affidavit of James Defeo ("Defeo Aff.").) Another deed recorded that same day transferred the Willoughby Avenue property from U.S. Bank to BRD. (Ex. A–3, annexed to Defeo Aff.)

### ii. Jackson Heights property

Morningstar prepared the title commitment for the Jackson Heights property and subsequently provided the title commitment to AmTrust.[5] Morningstar's Schedule A represents that effective January 10, 2009, Bangladesh American Trading, Inc. ("Bangladesh") acquired the property by deed, dated August 21, 2008, from Bashir Rahman. (Burke Aff. ¶¶ 11–12 Ex.

6.) Morningstar's title also indicates that Bashir Rahman acquired the property by deed, dated February 21, 2006, from Nicholas Montes and Ines Montes. (*Id.*) Morningstar's title commitment was inaccurate. Atlas' Schedule A for the Jackson Heights property represents that effective January 28, 2009, Bashir Rahman acquired the property by deed, dated February 21, 2006, from Nicholas Montes and Ines Montes. (Defeo Aff. Ex. G.) The deed transferring the property Bashir Rahman to Bangladesh was not recorded until February 6, 2009. (Defeo Aff. Ex. F.) The Jackson Heights property loan closed on February 4, 2009. (Atlas Dep. 141:7–23.)

### iii. Hempstead property

Morningstar prepared the title commitment for the Hempstead property. (DE 281.1 ¶ 21; Divney Decl. ¶ 9.) Morningstar's Schedule A represented that effective October 1, 2008, Bell Property & Management, Inc. ("Bell") acquired the property by deed, dated August 5, 2008, from Freemont Investment & Loan, Inc. ("Freemont"). (DE 281.1 ¶¶ 39–40; Divney Decl. Ex. F.) Morningstar's Schedule A was inaccurate. The Hempstead property was acquired by HSBC Bank, as the trustee under a Pooling and Service Agreement with Freemont Home Loan 2005–D, from Freemont by deed, dated December 9, 2008. (Defeo Aff. Ex. A–1; Atlas Dep. 179:23–180:3.) HSBC bank transferred the property to Bell by deed, dated December 10, 2008. (Atlas Dep. 181:10–18.) At the closing, the Schedule A prepared by Atlas represented that effective September 22, 2008, Bell (handwritten and crossing out the text "Freemont Investment &

---

**4.** "U.B. Bank National Association" appears to be a typographical error as "U.S. Bank National Association" is the entity that appears in the verified chain of title.

**5.** Although no party directly confirmed this transfer, Judge Orenstein made this factual finding based on the "MOR" prefix on the title commitment. (R & R 345 n. 4.) Atlas did not contest this factual finding.

Loan") acquired the property by deed, dated September 4, 2007, from David Kessler, Esq. (Defeo Aff. Ex. A–5; Atlas Dep. 172:23–174:24.) The Schedule A also indicates that the title to the property was recertified in Jordan's name from Bell, effective January 9, 2009. (Defeo Aff. Ex. A–5; Atlas Dep. 172:23–174:24.)

## II. Discussion

### a. Standard of Review

#### i. Report and Recommendation

■ A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review. 28 U.S.C. § 636(b)(1)(C); *see also Larocco v. Jackson,* No. 10–CV–1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. 28 U.S.C. § 636(b)(1)(C); *see also Larocco,* 2010 WL 5068006, at *2. The clearly erroneous standard also applies when a party makes only conclusory or general objections, or simply reiterates its original arguments. *See Rahman v. Fischer,* No. 10–CV–1496, 2014 WL 688980, at *1 (N.D.N.Y. Feb. 20, 2014) ("If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error." (citations omitted)); *Time Square Foods Imports LLC v. Philbin,* No. 12–CV–9101, 2014 WL 521242, at *2 (S.D.N.Y. Feb. 10, 2014) (clearly erroneous standard applies when party reiterates arguments made to the magistrate judge); *see also DePrima v. City of New York Dep't of Educ.,* No. 12–CV–3626, 2014 WL 1155282, at *3 (E.D.N.Y. Mar. 20, 2014) (collecting cases).

#### ii. Summary Judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.,* 558 Fed.Appx. 89, 89 (2d Cir.2014); *Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 843 (2d Cir.2013); *Kwong v. Bloomberg,* 723 F.3d 160, 164–65 (2d Cir.2013). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000).

### b. Unopposed recommendations

Plaintiff and Liberty did not object to Judge Orenstein's R & R and Atlas only

objected to certain recommendations. The Court has reviewed the unopposed portions of the R & R, and, finding no clear error, the Court adopts those recommendations pursuant to 28 U.S.C. § 636(b)(1). Specifically, the Court (1) grants Atlas' motion for summary judgment as to the claims of breach of contract, breach of fiduciary duty, negligent supervision, and negligence involving the Hempstead property; (2) denies Liberty's motion for summary judgment as to the claims of negligence, fraud, and conspiracy; and (3) denies Plaintiff's motion for summary judgment on its claims against Liberty.

### c. Atlas' objections

Atlas objects to Judge Orenstein's recommendations denying Atlas' motion for summary judgment as to the remaining negligence claims, fraud and conspiracy claims. For the reasons discussed below, the Court adopts Judge Orenstein's recommendations and denies Atlas' motion for summary judgment as to these claims.

### i. Negligence

■ To establish a *prima facie* case of negligence under New York law, "a plaintiff must demonstrate '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof.' " *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir.2014) (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013) and *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981)); *see also Solomon by Solomon v. City of New York*, 66 N.Y.2d 1026, 1027, 499 N.Y.S.2d 392, 489 N.E.2d 1294 (1985) (stating elements); *Jiminez v. Shahid*, 83 A.D.3d 900, 922 N.Y.S.2d 123, 124 (2011) (same). Furthermore, Plaintiff must establish that his injury was foreseeable. *See Sanchez v. State*

*of New York*, 99 N.Y.2d 247, 252, 754 N.Y.S.2d 621, 784 N.E.2d 675 (2002) ("[L]iability does not attach unless the harm is within the class of reasonably foreseeable hazards that the duty exists to prevent.").

Plaintiff alleges that Atlas acted negligently, with respect to all three loans in which Atlas participated. Judge Orenstein recommended that the Court deny Atlas' motion for summary judgment as to the Jackson Heights and Willoughby Avenue property. Each property is discussed below.

### 1. Jackson Heights property

With respect to the Jackson Heights property, Judge Orenstein found that a triable issue of material fact existed as to whether Atlas "either prepared or ratified the title commitment" and "failed to correct the inaccuracies in the documents Morningstar prepared after taking over the file." (R & R 352.) However, Judge Orenstein recommended that the Court grant partial summary judgment in Atlas' favor by dismissing any claims based on negligent supervision of Baker due to an absence of any evidence permitting an inference that Baker caused AmTrust to rely to its detriment on the false information in the title commitment. (*Id.* at 352.) Atlas objects to each ground upon which Judge Orenstein recommended that the Court deny summary judgment.

### A. Atlas' preparation or ratification of the title commitment

■ Although Morningstar produced the title commitment to the Jackson Heights property, the title commitment bears an effective date of January 10, 2009, as well as a fax stamp, which bears the date of January 29, 2009. (Divney Decl. Ex. G.) Both dates are subsequent to Morningstar ceasing operations. (DE 276 ¶¶ 9–10; DE 281.1 ¶¶ 9–10.) Judge Orenstein noted that although "[s]uch evidence

is by no means conclusive, ... it creates a genuine issue as to whether Atlas adopted the Jackson Heights title commitment ... by updating it or faxing it to AmTrust or one of its agents after Atlas took over from Morningstar." (R & R 351.) Atlas objects to Judge Orenstein's reliance on the January 10, 2009 date because there is no proof, nor does the R & R cite to any, that Atlas updated the title commitment to reflect January 10, 2009. Atlas also objects to Judge Orenstein's reliance on the fax stamp because there is no phone number listed, thereby the fax stamp does not indicate who faxed the document on January 29, 2009.

Although Atlas is correct in that there is no proof that it updated the title commitment on January 10, 2009, Atlas did "take over" Morningstar's responsibilities, (Atlas Dep. 21:22–22:1), and was paid for "[t]itle charges," (Defeo Aff. Ex. O). The Court agrees with Judge Orenstein that while this circumstantial evidence is far from "conclusive," it is enough to create a dispute as to a material fact, mainly, whether Atlas, ratified or adopted Morningstar's erroneous title commitment. Therefore, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment on this ground.

### B. Atlas' failure to correct the inaccuracies of the tile commitment

Judge Orenstein also concluded that, "even if Atlas neither prepared nor ratified Morningstar's title commitments for the Jackson Heights ... propert[y], it nevertheless breached its duty of care to AmTrust ...." (R & R 352.) Judge Orenstein supported his conclusion by relying on the fact that Atlas had in its possession an accurate Schedule A, which reflected that the Jackson Heights property did not meet AmTrust's seasoning requirement. Atlas's objection is two-pronged.

First, Atlas appears to argue that Judge Orenstein drew the incorrect inference from the fact that Atlas had in its files an alternative Schedule A that contained accurate information as to the chain of title related to the Jackson Heights property. (Atlas Obj. 9.) Atlas argues that its accurate Schedule A proves "that Atlas provided the correct information as to chain of title when they prepared their own title report." (Id. at 9.) Atlas has identified a plausible and reasonable inference, however, just as plausible and reasonable is the position articulated by Judge Orenstein in the R & R. Because the Court must draw all inferences in favor of the non-moving party, the Court finds that the accurate Schedule A in Atlas' possession is proof that it knew or should have known that the Schedule A transmitted to AmTrust contained erroneous information.

Second, Atlas argues that Plaintiff's evidence concerning AmTrust's seasoning requirement is inconsistent and therefore unreliable. (Id.) Atlas notes that Edward Brennan, a former AmTrust underwriter, testified that the seller had to be in title for three months prior to closing in order for the loan to be approved yet AmTrust's closing instructions to Carroll, its attorney, required that the seller be in title for one year prior to closing. (Id.) Any inconsistency in the evidence presented on AmTrust's seasoning requirement is peripheral to the question at hand: whether Atlas negligently failed to review the title commitment prepared by Morningstar to ensure that is contained accurate information. The Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment on this ground.

### C. Causation

The R & R did not discuss causation. Atlas argues that any conduct or omission on its part was not the proximate cause of

any damage suffered by AmTrust. (Atlas Obj. 11.)

■ "A [plaintiff] may act negligently without that negligence constituting a proximate cause of the accident. In order to find that [plaintiff's] negligence was a proximate cause of the harm caused, the jury must find that the negligence was a substantial factor in bringing about the injury." *Saladino v. Stewart & Stevenson Servs., Inc.*, 704 F.Supp.2d 237, 249 (E.D.N.Y.2010) (quoting *Forlastro ex rel. Estate of Forlastro v. Collins*, No. 07–CV–3288, 2008 WL 2791277, at *4 (S.D.N.Y. July 18, 2008)); *see also Clinton v. Brown & Williamson Holdings, Inc.*, No. 05–CV–9907, 2013 WL 3111122, at *9 (S.D.N.Y. June 20, 2013) ("In assessing whether one cause among many constitutes proximate cause, courts have engaged in inquiries such as whether a cause is a substantial factor in bringing about the harm, or whether the cause is too remotely or insignificantly related to the harm to be a legal basis for liability.") "Proximate cause serves to limit, for legal or policy reason, the responsibility of an actor for the consequences of his conduct." *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 178 (2d Cir.2013) (quoting *Monahan v. Weichert*, 82 A.D.2d 102, 442 N.Y.S.2d 295, 298 (1981)).

■ Atlas notes that the erroneous title commitment concerning the Jackson Heights property did not indicate that the owner had title for over a year, thus, Atlas argues that Carroll failed in his responsibility to ensure that AmTrust's seasoning requirement was satisfied. (Atlas Obj. 11.) Atlas further argues that had Carroll performed his duty, AmTrust would have suffered no loss. (*Id.* at 12.) The Court rejects Atlas' argument for two reasons. First, other evidence in the record indicates that AmTrust's seasoning requirement was only that the owner have title

for three months prior to the application date. (Brennan Aff. ¶ 5; *id.* Ex. 8.) This issue is disputed and better left to a jury. Second, it is well established that "[t]here can be more than one proximate cause of an accident." *Calderon–Scotti v. Rosenstein*, 119 A.D.3d 722, 989 N.Y.S.2d 514, 515 (2014) (quoting *Cox v. Nunez*, 23 A.D.3d 427, 805 N.Y.S.2d 604, 605 (2005)); *see also Auz v. Century Carpet, Inc.*, No. 12–CV–417, 2014 WL 199511, at *3 (S.D.N.Y. Jan. 17, 2014) ("There can be more than one proximate cause of an accident, and the issue of comparative negligence is generally a question for the jury to decide." (quoting *Jahangir v. Logan Bus Co., Inc.*, 89 A.D.3d 1064, 933 N.Y.S.2d 402, 403 (2011) (internal quotation marks omitted))). If Carroll and other AmTrust agents who relied upon the title commitments were acting pursuant to a three-month seasoning requirement, then Plaintiff has established that the false chain of title information was a substantial factor in causing AmTrust's injury. Given the outstanding factual dispute concerning the seasoning requirement, summary judgment is inappropriate. Accordingly, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff's negligence claim based on the Jackson Heights property.

### 2. Willoughby Avenue property

■ With respect to the Willoughby Avenue property, because Atlas conceded that it prepared the title commitment—but argued that the version in AmTrust's file was altered by another party—Judge Orenstein found that a jury could find that Atlas negligently prepared the title commitment in AmTrust's files. (R & R 352.) Atlas argues that the title commitment it prepared contained completely different information than that in AmTrust's files

and that there is no evidence that the title commitment in AmTrust's files was prepared by Atlas. (Atlas Obj. 10.) There is no question that Atlas alone was responsible for the title commitment prepared for the Willoughby Avenue property. Although Atlas argues that it never prepared Schedule A in AmTrust's possession, Baker testified otherwise. (*Compare id., with* Baker Dep. 199:11–13.) The dispute is material and thus must be decided by a jury. In addition, for the same reason as discussed above with respect to the Jackson Heights property, there is a disputed issue of material fact as to proximate cause that precludes granting Atlas' summary judgment motion. Accordingly, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff's negligence claim based on the Willoughby Avenue property.

### ii. Fraud

■ In order to prevail on a claim of fraud, under New York law, a plaintiff must prove five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir.2006) (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir.1997)); *Gladstone Bus. Loan, LLC v. Randa Corp.*, No. 09–CV–4225, 2009 WL 2524608, at *3 (S.D.N.Y. Aug. 17, 2009) (quoting *Schlaifer Nance & Co.*, 119 F.3d at 98); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 883 N.Y.S.2d 147, 910 N.E.2d 976 (2009) ("The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.").

· Judge Orenstein recommended that the Court deny Atlas' motion for summary judgment on Plaintiff's fraud and conspiracy claims. (R & R 353.) Atlas objects, arguing that Atlas never communicated with AmTrust and even if a misrepresentation was made, AmTrust did not rely on it. (Atlas Obj. 3–7.) Each argument is discussed below.

### 1. Atlas' communication

■ Atlas argues that it never made a misrepresentation to AmTrust because AmTrust never received any loan documents from Atlas. (Atlas Mem. 3.) Instead, AmTrust received all loan documents from its mortgage broker, Link One, or from its attorney, Carroll, "through a process by which [Link One or Carroll] would upload the loan documents to Am[T]rust's Gemstone lending system ...." (*Id.*) Atlas argues that, because it did not have access to the Gemstone lending system, "if any of the pre-approval loan documents constituted a misrepresentation that was materially false, it was Link One, not Atlas, that made the representation to Am[T]rust." (Atlas Obj. 6–7.) The R & R did not address this argument. The Court finds the argument without merit.

Atlas, as title agent for the three loans in question, at the very least, expected that its title commitments would reach an agent of AmTrust. As McMahon confirmed at her deposition, Atlas was responsible for providing an accurate description of title at the time of closing. (Atlas Dep. 18:25–19:4.) The title commitments prepared by Atlas were normally sent to the buyer's attorney, the seller's attorney, the bank attorney and the closer prior to closing. (*Id.* at 52:3–12.) Thus, by McMahon's own testimony, Atlas, in the normal course of business, did make representations to the

agents of banks, if not the banks themselves. This is sufficient to create a genuine dispute as to whether Atlas made any representations in the instant case.[6] *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 77 (2d Cir.2000) (noting that "so long as the plaintiff receives the substance of a defendant's misstatements, he or she may establish reliance on that information even if the defendant did not communicate with the plaintiff directly"); *Municipality of Bremanger v. Citigroup Global Markets Inc.,* No. 09–CV–7058, 2013 WL 1294615, at *19 (S.D.N.Y. Mar. 28, 2013) (noting that "a principal may recover for misrepresentations relied on by an agent" so long as such reliance is reasonable), *aff'd sub nom. Mun. Corp. of Bremanger v. Citigroup Global Markets Inc.,* 555 Fed.Appx. 85 (2d Cir.2014); *Jay Dees Inc. v. Defense Tech. Sys., Inc.,* No. 05–CV–6954, 2008 WL 4501652, at *5 (S.D.N.Y. Sept. 30, 2008) ("Reliance need not result from direct communication from defendant to plaintiff. There is no reason why a misrepresentation to the plaintiff's agent does not suffice . . . ."); *see also In re Beacon Associates Litig.,* 745 F.Supp.2d 386, 408 (S.D.N.Y.2010) (noting, in the securities fraud context, that "[i]t would be a strange result to allow a third party to make misrepresentations to a principal's agent, . . . and permit the third party to escape liability to the principal"); *cf. Rosen v. Spanierman,* 894 F.2d 28, 33 (2d Cir.1990) ("A third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him."); *In re Windsor Plumbing*

*Supply Co., Inc.,* 170 B.R. 503, 529 (Bankr. E.D.N.Y.1994) ("A plaintiff to whom the representations are not made directly may not recover for fraud unless the defendant intended or expected the misrepresentation to reach that particular plaintiff, or a class of persons including the plaintiff.").

## 2. Reliance

Atlas' primarily objection to Judge Orenstein's recommendation is based on the reliance element of Plaintiff's fraud claim. Atlas argues that Judge Orenstein erroneously concluded that AmTrust's underwriters were required to, and did, review title commitments prior to the closing of each loan in question. (Atlas Obj. 3.) According to Atlas, such a factual finding ignores the testimony of Stephen Trayte, former Senior Vice–President of Residential Credit for AmTrust. (*Id.*) Trayte testified that the closing attorney is responsible for verifying that title is clear at closing, and that it is not a requirement that AmTrust's underwriters review a certificate of title prior to closing. (Trayte Dep. 112:23–113:19.) Atlas concedes that Trayte further testified that if the title commitment were available prior to closing, it would be reviewed by AmTrust's underwriters, (*id.* at 113:10–12), but argues that it is "sheer speculation" that any such title commitment was reviewed with respect to any of the subject loans.

With respect to the Willoughby Avenue property, Atlas ignores that Judge Orenstein, in addition to relying on Trayte's testimony, also cited to a Notice of Loan Approval ("NOLA") form indicating that a preliminary title report was reviewed by AmTrust prior to closing. (*See* Willough-

---

**6.** At her deposition, McMahon believed that one title report "might have went to James Carroll at time of closing or prior to closing." (Atlas Dep. 52:13–19.) In its objections, Atlas clearly states that "[a]ny title reports prepared by [it] would have had to be sent to Link One or Carroll to upload into Gemstone." (Atlas Obj. 13–14.) Atlas, perhaps inadvertently, has identified the basis for denying summary judgment as to whether it ever made a representation to AmTrust.

by Avenue NOLA, annexed to Burke Aff. as Ex. 3.) The NOLA pertaining to Willoughby Avenue creates a genuine dispute as to whether AmTrust relied on an erroneous title commitment prior to closing.

AmTrust's files did not include a NOLA corresponding to the Jackson Heights property. However, the Jackson Heights property file did contain an Underwriter Findings Report ("UFR"), which indicated that a preliminary title report was required to ensure that the title commitment met all of AmTrust's requirements. (Jackson Heights UFR, annexed to Burke Aff. as Ex. 5.) Burke, a former AmTrust Senior Qualify Control Analyst/SIU, identified the title commitment with erroneous chain of title information, as the title commitment which was received and maintained by AmTrust in the regular course of business as a business record. (Burke Aff. ¶ 12.) Brennan, a former AmTrust underwriter, states that as an underwriter, he would recommend loans for denial if the chain of title did not conform to AmTrust's seasoning requirements. (Brennan Aff. ¶ 6.) He further states that an underwriter was required to review title commitments to verify compliance AmTrust seasoning requirements. (*Id.* ¶ 7.) And, Brennan further states that "AmTrust underwriters relied on the accuracy of the title commitments provided by the title agents prior to the closing for the Willoughby Avenue [t]ransaction ... and for the 87th Street [t]ransaction [Jackson Heights property] when they approved the loans for closing." (*Id.* ¶ 16.) This evidence suffices to create a genuine dispute as to whether, with respect to the Jackson Heights property, AmTrust reviewed and relied on a title commitment prior to closing the loan. Although Atlas notes that Brennan did not definitively state when the policy—that underwriters review title commitments—took effect,[7] drawing all inferences in favor of the non-moving party, the Court assumes that such a policy was in effect before February 4, 2009, during the period prior to the closing of the Jackson Heights loan.[8] Atlas' argument that such a policy was not in effect during the operative period is better directed toward a jury. Therefore, the Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff's fraud claim.

### iii.  Conspiracy

In addition to an underlying tort, a civil conspiracy claim requires Plaintiff to satisfy the following elements: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.'" *Bigio v. Coca–Cola Co.,* 675 F.3d 163, 176 (2d Cir.2012) (quoting *Abacus Fed. Sav. Bank v. Lim,* 75 A.D.3d 472, 905 N.Y.S.2d 585, 588 (2010) (internal quotation marks omitted)), *cert. denied,* 568 U.S. ——, 133 S.Ct. 952, 184 L.Ed.2d 752 (2013); *Decter v. Second Nature Therapeutic Program, LLC,* 42 F.Supp.3d 450, 463–64, 2014 WL 4378805, at *11 (E.D.N.Y. Sept. 5, 2014) (stating ele-

---

7.  At his deposition, Brennan stated that the requirement that an underwriter review title commitments was added "at some point in my employment ...." (Brennan Dep. 75:11–17.)

8.  The Court draws a similar favorable inference with respect to the effect of AmTrust's seasoning requirement as set forth in its Sell-

er's guide. (*See* Seller's Guide, annexed to Burke Aff. as Ex. 11.) Although the document itself is dated December 4, 2009, there is nothing in the record to suggest that the Seller's Guide, and its corresponding seasoning requirement, was not in effect during the period prior to the closing of the Willoughby Avenue and Jackson Heights property loans.

ments); *Apace Commc'ns, Ltd. v. Burke,* 17 F.Supp.3d 238, 246 (W.D.N.Y.2014) (same).

Judge Orenstein recommended that the Court deny Atlas' motion for summary judgment as to Plaintiff's civil conspiracy claim. (R & R 353.) Atlas argues that Judge Orenstein cited to no evidence demonstrating that Atlas had an agreement with anyone, performed an overt act in furtherance of any agreement or intentionally participated in the furtherance of any plan or purpose.[9] (Atlas Obj. 17.)

Plaintiff makes no allegation of an express agreement between any Defendants. However, absence of such an allegation is not fatal to Plaintiff's claim. "Usually the only evidence available is that of disconnected acts on the part of the individual conspirators, which acts, however, when taken together in connection with each other, show the conspiracy to secure a particular result quite as satisfactorily and conclusively as more direct proof." *Keviczky v. Lorber,* 290 N.Y. 297, 302, 49 N.E.2d 146 (1943); *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.,* 887 F.Supp.2d 459, 482 (E.D.N.Y. 2012) ("As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence." (quoting *Cofacredit S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 240 (2d Cir.1999))); *Miltland Raleigh–Durham v. Myers,* 807 F.Supp. 1025, 1053 (S.D.N.Y.1992) ("The formal agreement which defendants say is a necessity is not required."); *First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,* 629 F.Supp. 427, 443 (S.D.N.Y.1986) ("The lack of an express allegation of an agreement is not fatal to the plaintiffs' conspiracy claims.").

■ As discussed above, *infra* Part II. c.ii, a jury could reasonably find that Atlas intentionally sought to defraud AmTrust. There is a genuine dispute as to whether Atlas created an erroneous title commitment for the Willoughby Avenue property and created or intentionally failed to correct an erroneous title commitment for the Jackson Heights property. Judge Orenstein posited that there was no incentive for Atlas to defraud AmTrust unless pursuant to an agreement with others to get some benefit beyond its usual fee. The Court finds that this is a reasonable inference drawn in Plaintiff's favor. If a jury believes that AmTrust committed intentional fraud, it may also believe that a possible explanation for such misbehavior would be the collection of some nefarious benefit pursuant to a tacit agreement between Atlas and others. In addition, in order for any benefit to accrue from the alleged scheme, the alleged co-conspirators would have been dependent upon each other's performance. A reasonable jury could infer from such interdependence that the parties were operating pursuant to a tacit agreement. *See Environmental Servs., Inc. v. Recycle Green Servs., Inc.,* 7 F.Supp.3d 260, 275 (E.D.N.Y.2014) (noting, in the context of conspiracy claims pursuant to the Racketeer Influenced and Corrupt Organizations Act and common law, that "interdependence of activities and persons involved" can allow an inference of an implicit agreement between the parties); *Dell's Maraschino Cherries Co.,* 887 F.Supp.2d at 483 (denying summary judgment on the plaintiff's conspiracy claim due to the "interwoven nature of the relationship among" the alleged conspirators).

The Court also notes that McMahon testified to several acts which, drawing an

---

9. Atlas' objections to Judge Orenstein's conspiracy recommendation reassert the arguments already addressed and dismissed by the Court with respect to Plaintiff's underlying negligence and fraud claims. Those arguments merit no further discussion.

inference in Plaintiff's favor, could support the existence of a conspiracy to defraud AmTrust. McMahon admitted that the actions and files of Baker, the title closer, made McMahon "uncomfortable," yet Atlas continued with the three loans in question. (Atlas Dep. 30:19–24; 32:12–14.) Atlas also continued with its relationship with Baker despite an interaction with a "contact" of Baker's, Dirk Hall, who showed up at McMahon's home cursing and screaming. (*Id.* at 29:7–18; 79:25–80:6.) Hall was involved, in some capacity, in the closing of the Willoughby Avenue property. (*Id.* at 89:21–90:2.) Atlas also sent Hall an email discussing the Jackson Heights property, yet McMahon "ha[d] no idea" why Hall would have received such a communication from Atlas.

(*Id.* at 160:3–15.) From these discrete acts, in addition to the underlying tort of fraud already discussed, a jury could infer that Atlas, Baker, Hall and/or others were acting pursuant to an agreement to defraud AmTrust.

Atlas argues that the evidence in the record supports the conclusion that no agreement existed between any relevant party. Namely, Atlas never heard of Link One and had never meet Carroll, Baker or Hall prior to receiving Morningstar files. (Atlas Obj. 14.) Atlas' lack of familiarity with the alleged co-conspirators may convince a jury that there was no conspiracy at work here, but such an argument does not warrant granting Atlas' motion for summary judgment. The Court adopts Judge Orenstein's recommendation and denies Atlas' motion for summary judgment as to Plaintiff' conspiracy claim.

### III. Conclusion

Having considered Magistrate Judge Orenstein's Report & Recommendation and the accompanying objections, the Court adopts the Report & Recommendation in its entirety.

The Court (1) grants Atlas' motion for summary judgment as to the claims of breach of contract, breach of fiduciary duty, negligent supervision, and negligence involving the Hempstead property; (2) denies Atlas' motion for summary judgment as to the claims of negligence involving the Willoughby Avenue and Jackson Heights properties, fraud and conspiracy to commit fraud; and (3) denies Liberty's and Plaintiff's cross-motions for summary judgment as to all claims against Liberty.

SO ORDERED.

### REPORT AND RECOMMENDATION

JAMES ORENSTEIN, United States Magistrate Judge.

The Federal Deposit Insurance Corporation ("FDIC"), acting in its capacity as the Receiver for AmTrust Bank ("AmTrust"), accuses several persons and organizations—including defendants Liberty Land Abstract, Inc. ("Liberty") and Atlas Abstract Agency Corp. ("Atlas")—of improperly depriving it of millions of dollars in proceeds from AmTrust's loans. *See* Docket Entry ("DE") 211 (Corrected Amended Complaint) ("Complaint"). Atlas now seeks summary judgment on the claims against it of negligence, breach of contract, breach of fiduciary duty, fraud and conspiracy; and Liberty and the FDIC cross-move for summary judgment on the FDIC's claims of negligence, fraud and conspiracy against Liberty. DE 276; DE 283; DE 287. Upon a referral from the Honorable Margo K. Brodie, United States District Judge, I now make this report and, for the reasons set forth below, respectfully recommend that the court grant Atlas's motion to dismiss the FDIC's claims of breach of contract, breach of fiduciary duty, and certain portions of the

FDIC's negligence claims; in all other respects, I respectfully recommend that the court deny the motions.

## I. *Background*

### A. *Facts*

This action involves twenty residential mortgage loans made by AmTrust to borrowers in New York State over a four-month period in late 2008 and early 2009. Complaint ¶ 4. AmTrust filed its initial complaint on July 28, 2009. DE 1. On December 4, 2009, the Office of Thrift Supervision closed AmTrust and appointed the FDIC as its receiver; the FDIC was thereafter substituted as the plaintiff in this action. *See* DE 116; Order dated January 7, 2010.

The FDIC alleges that, as part of a scheme in which all of the defendants participated, individual borrowers were recruited to obtain mortgage loans from AmTrust using falsified loan applications, inflated property appraisals, and fraudulently executed loan documents. At the same time, the purported sellers in the transactions did not actually own the properties but were instead arranging to purchase the properties from the actual owners for a fraction of the price indicated on the mortgage and loan application documents that were submitted to AmTrust. Once a loan had closed, the purported seller would use a portion of the AmTrust loan proceeds to purchase the property from the original owner and then "flip" the property by re-deeding it to the borrowers, many of whom eventually defaulted on their mortgage loans. The remaining loan proceeds were divided up between the buyers, sellers, and the other defendants who helped facilitate the fraud. All 20 of the subject transactions involved the same mortgage broker, Link One Mortgage Bankers, LLC ("Link One"), as well as the same closing attorney, James Carroll ("Carroll"). The loans were initially sold on secondary markets; however, AmTrust and the FDIC were later required to repurchase the loans from Fannie Mae and Freddie Mac. The loans relevant to this motion are currently in default and, in some cases, secured by collateral valued at significantly less than the principal on the loan. Complaint ¶¶ 1–3, 6–12, 19–24.

The gravamen of the FDIC's claims against the title agent defendants, including Atlas and Liberty, is that they acted negligently or fraudulently with respect to the issuance of pre-closing title commitments that contained inaccurate or incomplete information regarding the title history of the subject properties. *Id.* ¶¶ 71–72. The FDIC contends that if the title agents had given AmTrust an accurate title history of the subject properties, the bank would not have approved the loans because it would have known that the subject properties did not satisfy the bank's "seasoning" requirement—that is, AmTrust would have declined to issue a mortgage loan where the seller had held title to the subject property for less than three months. Brennan Atlas Aff. ¶¶ 5–6; FDIC R. 56.1 ¶ 8.

The FDIC further alleges that AmTrust relied on two documents generated in the loan approval process to ensure compliance with its seasoning requirement. First, AmTrust relied on the Underwriting Findings Report ("UFR"): if the underwriting department included the seasoning requirement in the UFR's eligibility section, an AmTrust underwriter would know to scrutinize the loan application for proper seasoning. Second, the underwriter preparing the Notice of Loan Approval ("NOLA") for a loan would include a notation either that he or she had already reviewed a preliminary title commitment and found the seasoning requirement to be

met or that such a review had yet to be done and that it must be done as a "prior to close condition."[1] Brennan Liberty Aff. ¶¶ 7–8; Brennan Atlas Aff. ¶¶ 7–8.[2] With that background, I summarize the following undisputed facts pertinent to the instant motions.

### 1. *The Liberty Loans*

AmTrust engaged Liberty to serve as the original title agent on two loans at issue here: a loan of $536,000 to Merline Genece on November 28, 2008, to fund the purchase of the property located at 2256 Pacific Street, Brooklyn, New York (the "Pacific Street property"); and a loan of $520,800 to Jillian Berrios on January 16, 2009, to fund the purchase of the property located at 243–44 144th Avenue, Rosedale, New York (the "Rosedale property"). Liberty R. 56.1 at 2; FDIC R. 56.1 ¶¶ 1, 5, 10; *see* Complaint ¶¶ 505–06, 746–47. Liberty prepared, and provided to AmTrust, a title commitment for each loan. Liberty R. 56.1 at 2; FDIC Liberty 56.1 ¶ 15.

Liberty acted as the title agent for the sale of the Pacific Street property to Merline Genece through the closing on November 28, 2008. Lin Tr. at 54; FDIC Liberty 56.1 ¶ 28. Two versions of the title commitment prepared by Liberty appear in the record. The first, produced by AmTrust from its files with an effective date of September 30, 2008, indicates that title to the property was vested in Amfit Home Management, Inc. ("Amfit"), and that Amfit had acquired title to the property via an unrecorded deed from Shirley M. James dated July 15, 2008. Burke Liberty Aff. ¶ 6 & Ex. B (title commitment); *see* FDIC Liberty 56.1 ¶¶ 27–28; Lin Tr. at 78–80. The second is the final version of the title commitment that was marked up and used at the closing; it reflects the same chain of title information recited above with the effective date changed by hand from September 30, 2008, to the closing date of November 28, 2008. Watson Aff. ¶ 5 & Ex. 1 (title commitment); *see* Lin Tr. at 69–73. AmTrust's records reveal that the bank's underwriters were required to review, and in fact did review, a title commitment prior to approving the Pacific Street loan. *See* Burke Liberty Aff. ¶ 7 & Ex. C (UFR); *id.* ¶ 8 & Ex. D (NOLA).

Both versions of the title commitment were inaccurate. In fact, Recani, Inc., obtained title to the Pacific Street property

---

1. Although the record is not clear in this regard, the FDIC's submissions appear to indicate that the UFR and NOLA documents were prepared and used solely by AmTrust's underwriting department. The UFR appears to be preliminary in nature and therefore forward-looking, in that it instructs the AmTrust underwriter who will later evaluate a loan application to scrutinize the subject property for seasoning. In contrast, the NOLA appears to provide a retrospective report of the basis for a loan's approval, either noting that an AmTrust underwriter had approved the loan following review of the title commitment, or reporting that such a review had not yet taken place and should be done prior to closing.

2. The Appendix to this report summarizes the submissions I have reviewed and the abbreviations I use to cite them. Among those submissions are statements by each party in support of their respective motions of the material facts as to which it contends there is no genuine issue to be tried, counter-statements by the FDIC to the statements of Atlas and Liberty in support of their respective motions, and Liberty's statement in reply to the FDIC's counter-statement. *See* Loc. Civ. R. 56.1(a)-(b). A party's statements controverting any statement of material fact must be followed by citation to admissible evidence. *See* Loc. Civ. R. 56.1(d). Statements without citation to evidence may be properly ignored by the court. *See, e.g., Feis v. United States,* 394 Fed.Appx. 797, 799–800 (2d Cir. 2010); *Topalian v. Hartford Life Ins. Co.,* 945 F.Supp.2d 294, 298–301 n. 2 (E.D.N.Y.2013). I therefore disregard all factual assertions that have not been properly supported by citations to admissible evidence.

via a deed from Shirley M. James dated November 28, 2008. The deed from James to Recani was not recorded until December 30, 2008. On the same day, Recani deeded the property to Amfit; that deed was also recorded on December 30, 2008. The title closer who attended the Pacific Street closing on Liberty's behalf, Chi-Yuan Hwang, also notarized the deeds transferring title of the Pacific Street property from James to Recani and from Recani to Amfit. FDIC Liberty 56.1 ¶¶ 31–33, 36–37; Watson Aff. ¶¶ 6–7 & Exs. 2, 3 (deeds). Moreover, an abstractor's report in Liberty's files accurately reflected that the Pacific Street property was owned by Shirley M. James as of September 30, 2008. Watson Aff. ¶ 8 & Ex. 4.

Liberty did not issue title insurance or attend the closing for the Rosedale property. Lin Tr. at 104–05. However, Liberty prepared a title commitment for the property and emailed it to Carroll on January 15, 2009, when it withdrew as the title agent on the transaction. *Id.* at 106–09, 118–19; FDIC Liberty 56.1 ¶ 5. That title commitment indicated that, effective September 30, 2008, title to the Rosedale property was vested in Bell Property and Management ("Bell"), which had acquired title via an unrecorded deed dated August 27, 2008, from American Home 2007–SD2 REO LLC ("American Home"). Watson Aff. ¶ 9 & Ex. 5 (title commitment); *see* FDIC Liberty 56.1 ¶¶ 48–49; Lin Tr. at 108–11. That assertion was inaccurate, however; in fact, at the time of the Rosedale closing, Bell did not hold title to the property. Instead, the deed transferring title to Bell from American Home was dated January 12, 2009, and recorded on March 18, 2009. Watson Aff. ¶ 10 & Ex. 6 (deed); *see* FDIC Liberty 56.1 ¶¶ 52–53. AmTrust's records show that its underwriters were required to review, and in fact did review, a title commitment prior to

approving the Rosedale loan. *See* Burke Liberty Aff. ¶ 12 & Ex. G(UFR); *id.* ¶ 13 & Ex. H (NOLA).

## 2. *The Atlas Loans*

Atlas was involved in three of the loans at issue here: a loan of $324,000 to Lea Jordan on December 24, 2008, to fund the purchase of the property located at 140 Weir Street, Hempstead, New York (the "Hempstead property"); a loan of $611,250 to Waltnel Sosa on February 2, 2009, to fund the purchase of the property located at 485 Willoughby Avenue, Brooklyn, New York (the "Willoughby Avenue property"); and a loan of $533,850 to Kamrun Nahar on February 4, 2009, to fund the purchase of the property located at 35–16 87th Avenue, Jackson Heights, New York (the "Jackson Heights property"). Complaint ¶¶ 695–96, 827–28, 929–30.

The original title agent on all three loans was Morningstar, LLC, which ceased operations in December 2008. Security Title Guaranty Company of Baltimore ("Security") was the title insurer for both Atlas and Morningstar at the time. An attorney at Security, John Montinico, contacted the owner of Atlas, Felice McMahon, and "asked Atlas to assist Security" with certain of Morningstar's files. Montinico brought the files to Atlas and "told" Atlas to use Michelle Baker, a former Morningstar employee, as the closer on the loans—that is, as the person responsible for representing the title company at closing—because she was familiar with the files. Atlas R. 56.1 ¶ 10; FDIC Atlas 56.1 ¶ 10; Morginshteren Tr. at 16–17; *see* McMahon Tr. at 10, 19–24, 70–71, 173. Baker attended the closing of each of the three loans at issue here, acting as the closer on behalf of Atlas. Atlas R. 56.1 ¶ 12; FDIC Atlas 56.1 ¶ 12; McMahon Tr. at 103–04, 141, 169.

Morningstar prepared a title commitment for the Hempstead property with an effective date of October 1, 2008, and provided it to AmTrust. It indicated that Bell owned the property by virtue of a deed from Fremont Investment & Loan, Inc. ("Fremont"), dated August 5, 2008. Divney Aff. ¶ 9 & Ex. F (title commitment); FDIC Atlas 56.1 ¶¶ 21, 39–40. That description was inaccurate: in fact, the Hempstead property was transferred from Fremont to HSBC Bank, as the trustee under a Pooling and Servicing Agreement with Fremont Home Loan 2005–D, via a deed dated December 9, 2008, that was recorded on January 16, 2009. Defeo Aff. ¶ 6 & Ex. A–1 (deed); *see* McMahon Tr. at 179–80. Bell obtained title to the property via a deed from HSBC Bank that was executed on December 10, 2008, and recorded on January 16, 2009. McMahon Tr. at 181–82. In the marked-up title commitment used at the closing (which Atlas produced from its files), the transferor is changed by hand from Fremont to Bell and the effective date is recertified from September 22, 2008, to January 9, 2009. Defeo Aff. ¶ 10 & Ex. A–5 (title commitment); *see* McMahon Tr. at 172–73. Atlas also had in its files a title insurance policy—not issued by Atlas—reflecting Bell, rather than Lea Jordan, as the proposed insured as of January 7, 2009. Defeo Aff. ¶ 14 & Ex. E (title insurance policy); *see* McMahon Tr. at 182–85. According to AmTrust's records, its underwriters were required to review a title commitment prior to approving the Hempstead loan. *See* Brennan Atlas Aff. ¶ 11; Burke Atlas Aff. ¶ 10 & Ex. 5(UFR).[3]

Atlas acted as the title agent and prepared a title commitment for the Willoughby Avenue property. McMahon Aff. ¶¶ 8–9; McMahon Tr. at 103; *see also* Atlas Memo. at 3. That title commitment reflected that, effective January 1, 2009, Brooklyn Renaissance & Development, Inc. ("BRD"), held title to the property by virtue of a deed from UBS Real Estate Securities, Inc. ("UBS"), dated September 25, 2008, that had been recorded in Kings County. Burke Aff. ¶ 5 & Ex. 1. However, BRD did not actually own the Willoughby Avenue property on February 2, 2009, when the closing took place. Rather, UBS deeded the property to U.S. Bank in a trustee capacity and U.S. Bank had deeded the property to BRD; both deeds were executed on September 25, 2008, but neither was recorded until February 25, 2009, after the AmTrust loan had closed. Defeo Aff. ¶¶ 7–8 & Exs. A–2 (deed to U.S. Bank), A–3 (deed to BRD). According to AmTrust's records, its underwriters were required to, and did, review a title commitment prior to approving the Willoughby Avenue loan. *See* Burke Atlas Aff. ¶ 6 & Ex. 2(UFR); *id.* ¶ 7 & Ex. 3 (NOLA).

Morningstar prepared a title commitment for the Jackson Heights property and provided it to AmTrust.[4] It reflected that, as of January 10, 2009, Bangladesh American Trading, Inc. ("Bangladesh"), owned the property by virtue of a deed from Bashir Rahman dated August 21, 2008, that was recorded in Queens County. Burke Aff. ¶ 12 & Ex. 6. However, Atlas maintained in its files a schedule to that title commitment indicating that Bashir Rahman held title to the property as of

---

3. AmTrust's file included a UFR prospectively requiring seasoning review but did not include a NOLA reporting whether such a review was actually completed prior to closing.

4. Although the record is not explicit in this regard, the fact that Title Number on the title commitment for the Jackson Heights property begins with the "MOR" prefix associated with Morningstar rather than the "AAA" prefix associated with Atlas, *see* McMahon Aff. ¶ 7, suggests that Morningstar, rather than Atlas, prepared it.

January 28, 2009. Defeo Aff. ¶ 16 & Ex. G at 13–22. Moreover, the deed transferring ownership from Rahman to Bangladesh was not recorded until February 5, 2009, the day after the AmTrust closing. Defeo Aff. ¶ 15 & Ex. F. According to AmTrust's records, its underwriters were required to review a title commitment prior to approving the Jackson Heights loan. *See* Brennan Atlas Aff. ¶ 12; Burke Atlas Aff. ¶ 12 & Ex. 6(UFR).⁵

### B. *Proceedings*

AmTrust filed its initial complaint on July 28, 2009, asserting claims against both Atlas and Liberty for fraud and conspiracy, DE 1 ¶¶ 139–49, 212–23, and against Atlas for breach of contract, breach of fiduciary duty and negligence. *Id.* ¶¶ 224–54. Following its substitution as the named plaintiff, on July 30, 2012, the FDIC filed an amended complaint adding, as relevant here, a claim of negligence against Liberty. DE 208; DE 211 (Corrected Amended Complaint). Atlas answered on August 20, 2012, and Liberty on September 24, 2012. DE 212 (Atlas); DE 224 (Liberty). Following discovery, the parties filed the fully briefed instant motions on September 26, 2013. *See* DE 276 (Atlas); DE 283 (FDIC); DE 287 (Liberty). The court then referred the motions to me on September 28, 2013.

## II. *Discussion*

### A. *Summary Judgment*

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). In determining whether to grant summary judgment, a court is confined to issue-finding, not issue resolution. *Rasmussen v. Sigma Corp. of Am.,* 27 F.Supp.2d 388, 391 (E.D.N.Y.1998) (citations omitted). The court does not "weigh the evidence and resolve ... factual issues" but rather "determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Owens v. N.Y. City Hous. Auth.,* 934 F.2d 405, 408 (2d Cir.1991) (quoting *Gibson v. Am. Broadcasting Cos.,* 892 F.2d 1128, 1132 (2d Cir.1989)); *see also* Fed. R.Civ.P. 56(c). A fact is material if it " 'might affect the outcome of the suit under the governing law.'" *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue is presented if " 'the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Id.* In assessing the evidence, "all reasonable inferences are drawn in favor of the non-movant[.]" *Wellesley v. Debevoise & Plimpton LLP,* 346 Fed.Appx. 662, 662 (2d Cir.2009).

### B. *Liberty's Motion*

#### 1. *Negligence*

◼ To establish Liberty's liability for negligence, the FDIC must prove that Liberty owed a duty of care to AmTrust, that it breached that duty, and that it caused the FDIC to suffer damage as a proximate result. *See Banco Multiple Santa Cruz, S.A. v. Moreno,* 888 F.Supp.2d 356, 367 (E.D.N.Y.2012) (citing *Lombard v. Booz–Allen & Hamilton, Inc.,* 280 F.3d 209, 215

---

5. Here again, AmTrust's file included a UFR prospectively requiring seasoning review but did not include a NOLA reporting whether

such a review was actually completed prior to closing.

(2d Cir.2002)). Liberty contends it is entitled to summary judgment on the negligence claim because it owed no duty to AmTrust to provide accurate or complete title information regarding the Rosedale property, and because any breach of such a duty was not the proximate cause of the FDIC's damages as to either transaction.[6]

Liberty argues that because it neither served as the title agent at closing nor issued a title policy for the Rosedale transaction, it was not in contractual privity with AmTrust and therefore owed AmTrust no duty of care with respect to that loan. Tischler Dec. ¶ 6. In making that argument, Liberty relies on case law from other jurisdictions; the applicable law of New York, however, undermines its position. To establish the "functional equivalent" of privity, the FDIC need only show that Liberty was aware that AmTrust would use its report in connection with the loan approval process, that AmTrust relied on the report, and that Liberty engaged in some conduct evincing an understanding that AmTrust would rely on it. *See Kidd v. Havens*, 171 A.D.2d 336, 577 N.Y.S.2d 989, 991 (1991) (citing *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y. 417, 425, 541 N.Y.S.2d 335, 539 N.E.2d 91 (1989); *Credit Alliance Corp. v. Andersen & Co.*, 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (1985)). Liberty does not dispute that it was initially engaged to be the title agent for the Rosedale transaction or that it knew AmTrust was the lender who would ultimately use that document in deciding whether or not to approve a loan in

connection with the property. *See* Liberty R. 56.1 at 2; Lin Tr. at 31; Watson Aff. ¶ 9 & Ex. 5 (title commitment); FDIC Liberty 56.1 ¶ 47. I further conclude, as set forth below, that the FDIC has adduced sufficient evidence of AmTrust's reliance on the title commitment prepared by Liberty. Finally, although the parties dispute whether Liberty provided the Rosedale title commitment to Carroll (AmTrust's agent in the Rosedale transaction) or directly to AmTrust (*compare* Liberty R. 56.1 Rep. ¶ 16 *with* FDIC Liberty 56.1 ¶ 15, 48), the evidence in the record would plainly suffice to allow a fact-finder to infer that Liberty knew that AmTrust would rely on the commitment and that AmTrust's reliance was in fact "the end and aim of the transaction." *Kidd*, 577 N.Y.S.2d at 991. I therefore conclude that disputed issues of fact preclude summary judgment in Liberty's favor on the existence of privity with respect to the Rosedale transaction.

In arguing that it was not the proximate cause of AmTrust's damages, Liberty points to the deposition testimony of AmTrust executive Stephen J. Trayte as support for the proposition that AmTrust relied on Carroll and Link One to evaluate the title documentation at the closings in accordance with AmTrust's instructions—and therefore did not approve the loans in reliance on Liberty's work. *See* Tischler Dec. ¶ 40. Specifically, Liberty cites Trayte's testimony that AmTrust maintained a call center for closing attorneys to

---

6. Liberty also initially suggested that AmTrust has failed to establish any damages because, according to publicly-filed documents about the two subject properties, neither had been the subject of any foreclosure action. Liberty Memo. ¶ 30; Liberty Rule 56.1 Rep. ¶ 14. The FDIC responded that it was damaged because it was required to repurchase the loans from Fannie Mae "due to material mis-

representations regarding the loan[s] at origination" and because the loans are now in default. Fairweather Aff. ¶¶ 7, 9; Ruane Aff. ¶¶ 5–8. Liberty concedes, in its opposition to the FDIC's motion, that the loans are in default. Liberty Opp. at 17. I therefore conclude that the record suffices to allow a fact-finder to determine that the FDIC has suffered cognizable damages.

contact during the course of a closing for assistance in resolving issues with title documents; that AmTrust had procedures in place for brokers and closing attorneys to be approved to function as AmTrust's agents; and that a loan could be approved by AmTrust underwriters despite certain "red flags" or the lack of a title commitment in the AmTrust loan file. *Id.* ¶¶ 14, 22–27. Based on that testimony, Liberty asserts that AmTrust, as a matter of general policy, relied on title companies solely to ensure that the borrower on any AmTrust loan had clear title to the collateral property and that AmTrust secured a first lien position on that collateral, *id.* ¶ 25; and "delegated ... responsibility" to its closing attorneys and brokers—to the exclusion of the underwriting process—in making lending decisions. *Id.* ¶ 31. From there, Liberty infers that nobody at AmTrust ever reviewed Liberty's title commitments prior to closing, *id.* ¶ 27, and that some combination of misconduct by AmTrust's own agents and AmTrust's failure to supervise or monitor those agents was therefore the proximate cause of the FDIC's damages. Liberty Rep. at 2–3.

Liberty's argument has several flaws. First, it is based on an unduly selective reading of Trayte's testimony. Trayte explicitly stated that if a title commitment was in the loan file prior to closing, it was reviewed. Trayte Tr. at 113. A fact-finder could infer from that testimony that it was AmTrust's policy to review the title commitment if it was present in the loan file at the time an underwriter reviewed the file. AmTrust's reliance on the procedures its agents were to follow during and after closing in order to secure a first lien position does not in any way preclude reliance on an additional review of title documentation by its underwriters prior to closing.

Second, Liberty's reliance on a portion of Trayte's testimony ignores the equally competent evidence provided by other former AmTrust employees. For example, former AmTrust underwriter Edward Brennan ("Brennan") stated that he understood the forms that AmTrust used for each of the loans at issue—the UFR and NOLA—to require AmTrust underwriters to review a title commitment prior to approving each loan. Brennan Liberty Aff. ¶¶ 4–16. Liberty discounts such evidence as "form documents" and calls attention to the absence of any testimony from the underwriter who actually reviewed the Pacific Street and Rosedale loan applications. Liberty Rep. at 3. Its argument in that respect may or may not persuade a jury, but it does not preclude a rational fact-finder from determining that an AmTrust underwriter did, in fact, review the erroneous title commitments that Liberty provided. Accordingly, Liberty has not demonstrated that it is entitled to summary judgment in its favor on the FDIC's negligence claim.

### 2. *Fraud*

To prove its fraud claim against Liberty under New York law, the FDIC must establish that Liberty made a representation (or material omission) of fact that it knew to be false, that it did so for the purpose of inducing AmTrust to rely upon it, that AmTrust justifiably relied on the misrepresentation or omission, and that the FDIC has been injured as a result. *See Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir.2009) (quoting *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)). Liberty asserts that the FDIC has failed to produce any evidence of fraud or conspiracy and has not established that Liberty had any agreement or even any relationship with any other party accused of wrongdoing. Tis-

chler Dec. ¶¶ 45–46. However, as discussed above, the evidence in the record suffices to allow a reasonable jury to find that Liberty made material misrepresentations with respect to the two loans at issue and that AmTrust justifiably relied on those misrepresentations to its (and ultimately the FDIC's) detriment. This portion of Liberty's motion thus reduces to a question of whether the record allows a jury to infer Liberty's scienter.

██ It is Liberty's burden to establish that there is no genuine issue of fact regarding whether it made the misrepresentations at issue with knowledge of their falsity, or whether it did so to defraud AmTrust. Drawing all inferences in favor of the FDIC, I conclude that Liberty has not met that burden. Both of the Liberty title commitments contradicted publicly-available documents to make false factual assertions that appeared to satisfy AmTrust's seasoning requirement, and in both cases Liberty's own files included evidence that those factual assertions were false. Liberty surmises that the false information may have come from telephone conversations with the non-party individual who originally engaged Liberty as the title agent. Lin Tr. at 59–60, 111–13. Again, that is an argument that might persuade a jury to reject the FDIC's claim, but it does not suffice to warrant summary judgment because a jury could just as well infer from the evidence in the record that Liberty knew its reports were false and intended to defraud AmTrust. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir.2009) (directing courts to be "lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences") (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir.1999)). I therefore respectfully recommend that the court deny summary judgment in Liberty's favor on the FDIC's fraud claim.

### 3. Conspiracy

To prove its conspiracy claim under New York law, the FDIC must prove that Liberty entered into a corrupt agreement with at least one other person or entity, that there was an overt act in furtherance of the agreement, that the parties to the agreement intentionally participated in the furtherance of a plan or purpose, and that the FDIC suffered damage or injury as a result. *First Capital Inv. Holdings LLC v. Wilson Capital Grp., Inc.*, 2010 WL 4967833, at *2 (S.D.N.Y. Nov. 30, 2010). Civil conspiracy is not an independent tort under New York law, but instead serves "only to connect the actions of separate defendants with an otherwise actionable tort." *Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986). An underlying fraud claim can act as the basis for a claim of conspiracy. *See Vasile v. Dean Witter Reynolds Inc.*, 20 F.Supp.2d 465, 481–82 (E.D.N.Y.1998).

██ Liberty argues that it is entitled to summary judgment on the conspiracy claim because the FDIC has offered no evidence of an express agreement to defraud AmTrust. Tischler Dec. ¶ 45. Such argument rests on an erroneous view of the law: the FDIC need not provide direct evidence of an express agreement to prove its claim; rather, "disconnected acts, when taken together, may satisfactorily establish a conspiracy." *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, 2005 WL 1902780, at *17 (S.D.N.Y. Aug. 9, 2005).

██ The evidence in the record plainly allows a reasonable jury to conclude that Liberty's actions in issuing erroneous title commitments constituted an overt act that furthered an agreement it knowingly and intentionally entered to defraud AmTrust.

In particular, a jury could infer from Liberty's unquestioning acceptance of title information from others about the subject properties, as well as other circumstantial evidence, that it agreed, explicitly or implicitly, to defraud AmTrust.[7] Indeed, a jury that permissibly found Liberty to have made material misstatements of fact upon which it expected AmTrust to rely could also fairly infer that Liberty would have no incentive to engage in such misconduct solely for the benefit of its own business mission, but would instead have done so only pursuant to an agreement with others from which it expected to derive some benefit beyond the usual fee for its work. Accordingly, I respectfully recommend that the court deny Liberty's motion for summary judgment on the FDIC's conspiracy claim.

## C. *The FDIC's Motion*

■ Although former AmTrust underwriter Brennan's testimony, and the documents he cites, would permit a jury to conclude that AmTrust reviewed and relied on Liberty's erroneous title commitments, such evidence does not necessarily compel such a finding. Even if it did, to prove that Liberty's negligently-prepared title commitments were the proximate cause of its damages relating to the Rosedale and Pacific Street properties, the FDIC must also establish that AmTrust would have denied the pertinent loan applications if Liberty had provided accurate information. The record, however, includes conflicting testimony about how an AmTrust underwriter would have treated such information. For example, although the FDIC contends that loans "were not eligible to be funded" where the subject property did not meet the seasoning requirement, FDIC Rep. at 1, Trayte testified that it "has happened" that AmTrust had cleared a loan for closing without its underwriters having reviewed a title commitment. Trayte Tr. at 113. Moreover, there is evidence that at least two of the title commitments (for the Pacific Street and Rosedale properties) reflected deeds that had not yet been recorded. Trayte testified that he "would expect an underwriter to question" an unrecorded deed in a title commitment, Trayte Tr. at 190, yet no such questions were apparently raised by AmTrust's underwriters prior to approving the Pacific Street and Rosedale loans. Finally, and perhaps most fundamentally, Trayte testified that, depending on the circumstances, AmTrust's seasoning requirement could be waived by an underwriter—without any further need to consult a supervisor—if the other circumstances surrounding the loan warranted approval. Trayte Tr. at 203–04. Such evidence would permit a rational jury to conclude either that AmTrust's lending policies were unclear to its underwriters,

---

7. For example, Liberty's agent at the Pacific Street closing acted as the notary on two deeds that effectively "flipped" the property from Shirley M. James to Recani, Inc., to Amfit on the same day AmTrust made the loan that is at issue here. Watson Aff. ¶¶ 6–7 & Exs. 2, 3 (deeds). Recani was nowhere to be found in either title commitment issued by Liberty, *see* Burke Liberty Aff. ¶ 6 & Ex. B (preliminary title commitment); Watson Aff. ¶ 5 & Ex. 1 (post-closing title commitment), despite the fact that its agent acted as the notary on the deeds effecting that transfer and its president openly acknowledged "the trans-action that was occurring in the second room." Lin Tr. at 81. Moreover, without apparent concern as to how it would be used, Liberty emailed a title commitment regarding the Rosedale property—which was inaccurate according to publicly-available records, and was not present in its files when the time came for production in this litigation—to Carroll when it withdrew as the title agent on that loan, *see* Lin Tr. at 108–10, notwithstanding the fact that it withdrew out of concern as to "the propriety of the various transfers and the entities and persons involved." Tischler Dec. ¶ 20.

or that the underwriters failed consistently to adhere to them. Either of those permissible findings would allow a jury to conclude that Liberty's conduct was not the proximate cause of the FDIC's damages. I respectfully recommend that the court deny the FDIC's motion for summary judgment on its claims against Liberty.

### D. *Atlas's Motion*

### 1. *Uncontested Portions of the Motion*

Atlas seeks summary judgment as to the FDIC's claims of negligence, breach of fiduciary duty and breach of contract pertaining to Atlas's alleged failure to obtain title insurance or properly record AmTrust's mortgage with respect to the Hempstead property. Complaint ¶¶ 226–44, 249–54. The FDIC does not address those claims in its opposition to Atlas's motion, and I therefore respectfully recommend that the court grant Atlas's motion as it pertains to those portions of the Complaint.

### 2. *Negligence*

The FDIC contends that Atlas was negligent in three ways. First, with respect to all three of the loans in which Atlas was involved—relating to the Hempstead, Willoughby Avenue, and Jackson Heights properties, respectively—the FDIC faults Atlas for failing to provide title commitments that accurately identified each property's owner of record. Second, the FDIC asserts that Atlas was negligent in supplying the title commitment for the Willoughby Avenue property to Baker and others in Microsoft Word format, which allowed for the information to be easily altered. Third, the FDIC alleges that Atlas was negligent in supervising Baker. *Id.* ¶¶ 256–57; 264–65; 270–76. I consider each claim in turn.

With respect to the loan for the Jackson Heights property, the FDIC relies in part on the theory that Atlas was negligent either in preparing the inaccurate title commitment or in adopting as its own the inaccurate document Morningstar prepared. *See* FDIC Atlas Opp. at 18; Complaint ¶ 257. The record suffices to allow a rational jury to accept that theory by finding that Atlas either prepared or ratified the title commitment upon which AmTrust relied.[8] Although the title number on the document maintained in AmTrust's files indicates that Morningstar produced it, the document recites an effective date of January 10, 2009—a date well after Morningstar ceased operations—and it bears a fax stamp dated later that same month. *See* Divney Aff. ¶ 10 & Ex. G. Such evidence is by no means conclusive, but it creates a genuine issue as to whether Atlas adopted the Jackson Heights title commitment—regardless of who prepared it—by updating it or faxing it to AmTrust or one of its agents after Atlas took the file over from Morningstar.

Moreover, with respect to the loans for both the Jackson Heights and Hempstead properties, the FDIC contends that even if Atlas did not create or affirmatively adopt the title commitments, it nevertheless was

---

**8.** Atlas further argues that the FDIC cannot show that AmTrust relied on the pertinent title commitments and therefore cannot establish the element of proximate causation of its injuries. Atlas Rep. at 15–19. I conclude that Atlas is no more entitled to summary judgment on the basis of such an argument than is Liberty. As explained above with respect to Liberty's motion (part B.1 of this discussion), the evidence in the record suffices to allow a jury to conclude that AmTrust relied on title commitments to determine whether a subject property had sufficient seasoning, and could therefore conclude that the falsity of a title commitment was the proximate cause of damages arising from the resulting loan's default.

negligent in failing to correct the inaccuracies in the documents Morningstar prepared after taking over the file. FDIC Atlas Opp. at 18; *see* Complaint ¶ 257. On this issue as well, the evidence in the record suffices to preclude summary judgment in Atlas's favor. There is no dispute that Atlas's owner, Felice McMahon, found that the files Atlas received from Morningstar were "a mess" and that as a result she "reordered ... the abstracts" and "reread all the files," including the title reports, from all the files that Atlas received from Morningstar. McMahon Tr. at 25–26. McMahon's stated goal in doing so was to "verify that [Baker's] clients [we]re good and that these deals were okay." *Id.* at 26. Further, documents produced from Atlas's own files suffice to support the proposition that Atlas could and should have realized that the title commitments previously provided to AmTrust contained inaccuracies. For example, Atlas's files on two properties held documents—a title insurance policy issued by another company in its Hempstead file, and an alternate Schedule A in its Jackson Heights file—that contradicted the title commitments AmTrust received and accurately indicated that AmTrust's seasoning requirement was not satisfied. *See* Defeo Aff. ¶ 14 & Ex. E (Hempstead property); Defeo Aff. ¶ 16 & Ex. G at 13–22 (Jackson Heights property). Atlas's claim that it was retained "to finish the work necessary to close the loans, not to redo work done by Morningstar" (Atlas Rep. at 6) thus misses the point: regardless of the extent to which

closing a loan did or did not require Atlas to redo work that Morningstar had previously performed, by undertaking to "finish the work necessary to close" loans that would not be approved absent a title commitment that reliably reflected sufficient seasoning, Atlas accepted a duty of care that required it to avoid misleading AmTrust. I therefore conclude a reasonably jury could find that even if Atlas neither prepared nor ratified Morningstar's title commitments for the Jackson Heights and Hempstead properties, it nevertheless breached its duty of care to AmTrust with respect to both properties.

As to the loan for the Willoughby Avenue property, Atlas concedes that it prepared the title commitment but alleges that the version found in AmTrust's loan file had been altered. McMahon Aff. ¶¶ 8–9. Atlas is of course free to argue to the jury that "someone must have altered" the title commitment it prepared, but it has not identified any evidence that would leave the jury no choice but to agree. To the contrary, a rational jury could plainly infer, particularly in the absence of any affirmative evidence of tampering, that the document AmTrust received contained the same information as the version that Atlas prepared.[9] Accordingly, I conclude that Atlas is not entitled to summary judgment in its favor based on this portion of its motion.

Finally, to the extent the FDIC's negligence claim against Atlas is predicated on a theory that Atlas failed to properly su-

---

**9.** Although the FDIC contends that the evidence suffices to allow a jury to infer that the version Atlas sent AmTrust was inaccurate, it also argues that even if the title commitment was somehow altered after Atlas prepared it, Atlas was nevertheless negligent in sending the document in an electronic format that permitted such unauthorized alteration. FDIC Atlas Opp. at 9–10, 19; *see* Complaint ¶¶ 255–57; 270–76. I disagree: absent any

proof that Atlas had an affirmative reason to anticipate the possibility of such tampering—and the FDIC does not cite any such evidence, *see* FDIC Atlas Opp. at 18–20—Atlas's duty of care did not include an obligation to disseminate its title commitment in a tamper-proof format. *See Derdiarian v. Felix Contr. Co.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 (1980) (citing cases).

pervise Baker with respect to the preparation of the title commitments, *see* Complaint ¶¶ 264–65, I recommend granting partial summary judgment in Atlas's favor. While the evidence suffices to allow a jury to find that Baker was Atlas's agent, *see* Atlas R. 56.1 ¶ 12; McMahon Tr. at 103–04, 141, 169, such a finding does not suffice to establish liability. The FDIC has not adduced sufficient evidence that Baker herself—whether as Atlas's agent or as an independent contractor—negligently prepared or sent the title commitments on which AmTrust relied. The FDIC points to a fax header on the Willoughby Avenue title commitment with similarities to other faxes sent by Baker, FDIC Atlas Opp. at 10–11, 14–19; *see* Burke Aff. ¶ 5 & Ex. 1 (title commitment), and a pre-closing checklist indicating that Baker was responsible for obtaining a deed from BRD. Defeo Aff. ¶ 24 & Ex. N. Such evidence does not suffice to permit an inference that Baker had a role in causing AmTrust to rely to its detriment on false information in any title commitment.

### 3. *Fraud and Conspiracy*

Based on the contentions discussed above that it did not prepare or submit the pertinent title commitments, Atlas argues the FDIC's fraud and conspiracy claims are also subject to summary dismissal. *See* Atlas Memo. at 11–15; Atlas Rep. at 3. For the same reasons discussed above that preclude summary judgment based on the proposition that Atlas cannot be held responsible for the title commitments with respect to the negligence claim, I conclude that such argument does not warrant relief with respect to the fraud and conspiracy claims either.

Moreover, I conclude that the FDIC has set forth sufficient evidence of fraud and conspiracy on substantially the same grounds as set forth above with regard to Liberty. Atlas allegedly prepared an inac-

curate title commitment for the Willoughby Avenue property; it failed to correct or even note the inaccuracy of the title commitments produced by Morningstar after it assumed the role of title agent in the subject transactions; each title commitment falsely indicated that the ultimate seller in the AmTrust transaction was the record owner of the respective property before that was actually the case; and in each case, the result was that the loan applications inaccurately appeared to satisfy AmTrust's seasoning requirement. The evidence also suffices to allow a jury to find that Atlas provided such inaccurate information notwithstanding the fact that it had the ability and duty to prevent AmTrust from having such an inaccurate understanding of the status of title as to each subject property. Taken in the light most favorable to the FDIC, a reasonable jury could infer from such evidence that Atlas's actions were taken in furtherance of a tacit agreement with others to defraud AmTrust. I therefore respectfully recommend that the court deny the motion for summary judgment as to the FDIC's claims of fraud and conspiracy against Atlas.

### III. *Recommendation*

For the reasons set forth above, I respectfully recommend that the court grant Atlas's motion as to the claims of breach of contract, breach of fiduciary duty, and negligence with respect to its alleged failure to obtain title insurance or properly record AmTrust's mortgage on the Hempstead property, as well as partial summary judgment on the FDIC's claim of negligent supervision; in all other respects, I respectfully recommend that the court deny the motions.

### IV. *Objections*

Any objections to this Report and Recommendation must be filed no later than

September 8, 2014. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. See 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir.2010).

SO ORDERED.

Dated: August 22, 2014.

### APPENDIX: LIST OF SUBMISSIONS AND ABBREVIATIONS

| DE | Description | Abbreviation |
| --- | --- | --- |
| | Submissions on Atlas's motion | |
| 278 | Atlas memorandum supporting its own motion | Atlas Memo. |
| 276 at 4–7 | Atlas Rule 56.1 statement | Atlas Rule 56.1 |
| 277 | Affidavit of Felice McMahon | McMahon Aff. |
| 277–1 | Transcript of deposition of Felice McMahon | McMahon Tr. |
| 280 | Affidavit of Brian Divney | Divney Aff. |
| 280–4 | Transcript of deposition of Stephen Trayte | Trayte Tr. |
| 280–5 | Transcript of deposition of James Carroll | Carroll Tr. |
| 281 | FDIC memorandum opposing Atlas's motion | FDIC Atlas Opp. |
| 281–1 | FDIC Rule 56.1 statement and response to Atlas's statement | FDIC Atlas 56.1 |
| 281–2 | Affidavit of Edward Brennan | Brennan Atlas Aff. |
| 281–3 | Affidavit of Melanie Burke | Burke Atlas Aff. |
| 281–12 | Affidavit of James Defeo | Defeo Aff. |
| 281–19 | Transcript of deposition of Alla Morginshteren | Morginshteren Tr. |
| 279 | Atlas reply memorandum supporting its own motion | Atlas Rep. |
| | Submissions on the FDIC's motion | |
| 283–1 | FDIC memorandum supporting its own motion | FDIC Memo. |
| 283–2 | FDIC Rule 56.1 Statement | FDIC R. 56.1 |
| 283–3 | Affidavit of Laura Watson | Watson Aff. |
| 283–4 | Affidavit of Melanie Burke | Burke Liberty Aff. |
| 283–5 | Affidavit of Edward Brennan | Brennan Liberty Aff. |
| 283–6 | Affidavit of Jeanne Fairweather | Fairweather Aff. |
| 283–7 | Affidavit of Thomas Ruane | Ruane Aff. |
| 288 | Liberty memorandum opposing FDIC's motion | Liberty Opp. |
| 284 | FDIC reply memorandum supporting its own motion | FDIC Rep. |
| | Submissions on Liberty's motion | |
| 287 at 27–29 | Declaration of Karl Lin | Lin Dec. |
| 287 at 4–26 | Declaration of Perry Ian Tischler supporting Liberty's motion | Tischler Dec. |
| 287–4 | Transcript of deposition of Karl Lin | Lin Tr. |
| 287–8 | Liberty Rule 56.1 statement | Liberty R. 56.1 |
| 282 | FDIC memorandum opposing Liberty's motion | FDIC Liberty Opp. |
| 282–1 | FDIC Rule 56.1 statement and response to Liberty's statement | FDIC Liberty 56.1 |
| 289 | Liberty reply memorandum supporting its own motion | Liberty Rep. |
| 290 | Liberty Rule 56.1 statement and response to FDIC's statement | Liberty R. 56.1 Rep. |